The READING COMPANY

v.

The CITY OF PHILADELPHIA, et al.

No. 91–2377.

United States District Court, E.D. Pennsylvania.

May 11, 1993.

Steven J. Engelmyer, Hangley, Connolly, Epstein, Chicco, Foxman & Ewing, Albert G. Bixler, John F. O'Riordan, Hangley, Connolly, Epstein, Chicco, Foxman & Ewing, Philadelphia, PA for Reading Co.

Kenneth J. Warren, Manko, Gold & Katcher, Bala Cynwyd, PA, Patrick K. O'Neill, R. Matthew Pettigrew, Jr., Asst. City Sol., Philadelphia, PA, Marc L. Frohman, Manko, Gold & Katcher, Bala Cynwyd, PA, Dennis Michael Abraham, Asst. City Sol., Philadelphia, PA, for City of Philadelphia.

Martina Bernstein, Morgan, Lewis & Bockius, Bradford F. Whitman, Reed, Smith, Shaw & Mc Clay, Philadelphia, PA, Peter A. Glascott, County Sol., Doylestown, PA, Marilyn Heffley, Reed, Smith, Shaw & McClay, Philadelphia, PA, William C. Roeger, Jr., Asst. County Sol., Doylestown, PA, for County of Bucks.

Martina Bernstein, Morgan, Lewis & Bockius, Philadelphia, PA, John S. Halsted, Chester County Sol., West Chester, PA, Jami Wintz McKeon, Morgan, Lewis & Bockius, Philadelphia, PA, Marilyn Heffley, Reed, Smith, Shaw & McClay, Philadelphia, PA, for County of Chester.

William F. Holsten, II, Paola F. Tripodi, Holsten & White, Media, PA, for County of Delaware.

Martina Bernstein, Jami Wintz McKeon, Morgan, Lewis & Bockius, Marilyn Heffley, Reed, Smith, Shaw & McClay, Philadelphia, PA, Frederic M. Wentz, Montgomery County Courthouse Sol., Norristown, PA, for County of Montgomery.

Alan C. Gershenson, Roger F. Cox, Ann B. Laupheimer, Jerome R. Richter, Patrick J. McDonnell, Blank, Rome, Comisky & McCauley, Philadelphia, PA, for Southeast Pennsylvania Transp. Authority.

David Richman, Colleen F. Coonelly, Pepper, Hamilton & Scheetz, Janet L. Scagnelli, Philadelphia, PA, for Consolidated Rail Corp.

Beth Liss Shuman, Office of Chief Counsel, Bureau of Hazardous Sites, Harrisburg, PA, for Com. of Pennsylvania, Dept. of Environmental Resources.

### MEMORANDUM AND ORDER

YOHN, District Judge.

The Reading Company ("Reading") commenced a suit against defendants under the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA"), as amended, 42 U.S.C.A. §§ 9601–9675 and the Pennsylvania Hazardous Sites Cleanup Act ("HSCA"), 35 Pa.Stat. Ann. §§ 6020.101–6020.1305. Reading seeks contribution from defendants for their share of the $8.6 million in clean-up costs already incurred by it, as well as any future costs incurred, in removing polychlorinated biphenyls ("PCBs") from the viaduct which formerly bore tracks of the Ninth Street branch of the Reading Railroad to the Reading Terminal train shed, the Reading Terminal train

shed, the structures associated with that train shed, the structural components of the train shed, and the interstitial materials lying between the floor of the train shed and the ceiling of the Reading Terminal Market. Defendants SEPTA, Conrail, Bucks County, Chester County, and Montgomery County[1] have filed a motion for summary judgment on all claims asserted against them. For the reasons explicated below, the court denies the motion for summary judgment.

## DISCUSSION

### I. The Facts

This case involves an enormous number of facts. Therefore, in an effort to achieve clarity, the court subdivides the pertinent facts.

*General background*

Reading operated both freight and passenger rail service. Its passenger service was extant in 1893 and perhaps earlier.

For many years, Reading ran steam-powered locomotives on its passenger lines. Around 1930, Reading commenced electrification of its rail lines. The company electrified the last of its passenger lines in 1961.

Reading utilized self-propelled electric railroad cars on the electrified rail lines. The electric railcars housed traction motors that in turn contained electrical transformers. These electrical transformers contained oils mixed with PCBs.

Due to the normal operation of these transformers and to leaks in them, the transformers released PCBs into the railbeds underneath them. As a result of the releases of PCBs, the train shed (including the Reading Terminal train shed, the structures associated with that train shed, the structural components of the train shed, and the interstitial materials located between the floor of the train shed and the ceiling of the Reading Terminal market) and the viaduct that formerly bore the tracks of the Ninth Street branch of the Reading Railroad to the train shed became contaminated.

During the 1950's, Reading suffered a severe decline in the number of passengers using its commuter rail lines. This decline in riders placed the continued existence of commuter rail operations between Philadelphia and the nearby counties of southeastern Pennsylvania in jeopardy.

In response to the threatened discontinuance of commuter service between Philadelphia and the surrounding counties, in 1958, the City of Philadelphia (the "City") entered into a series of contracts with Reading to increase service and decrease fares on selected rail lines, mostly within the city. By the end of 1960, the City created the Passenger Service Improvement Corporation ("PSIC") to manage the plan to increase service and decrease fares on the six in-city rail lines.

Realizing that the burgeoning mass transportation crisis necessitated a regional approach to the problem, in September 1961, Bucks, Chester, and Montgomery Counties joined with the City to form the Southeastern Pennsylvania Transportation Compact ("SEPACT"). SEPACT planned to increase ridership on commuter rail lines by increasing the quality and quantity of service and decreasing fares.

SEPACT applied for and received a demonstration grant from the Housing and Home Finance Agency ("HHFA") (later replaced by the Urban Transportation Administration under the U.S. Department of Housing and Urban Development) pursuant to the Housing Act of 1961. The first demonstration project, christened SEPACT I, commenced during the last week of October 1962 and lasted for three years, ending in October 1965. The project cost $4.7 million, two-thirds of which was paid for by the federal government and the remaining one-third of which was contributed by the local participants.

Reading's Philadelphia to Lansdale line and its Glendale to Hatboro branch, along with the Pennsylvania Railroad's commuter

---

1. SEPTA filed the summary judgment motion and accompanying briefs. Conrail joined SEPTA's motion for summary judgment and separately briefed some issues. The three counties simply joined the motion for summary judgment.

When discussing arguments advanced by all the defendants moving for summary judgment, the court generally will refer to only one defendant, SEPTA.

service between Philadelphia and Levittown, served as demonstration lines for SEPACT I.

Although SEPACT I successfully increased ridership on the demonstration lines, overall the volume of commuters riding on the Reading system declined. Because of the continued passenger deficit, Reading applied for service abandonments.

In response to the escalating mass transportation crisis, SEPACT III, known as Operation Reading, evolved. This project's goal was to increase ridership on all seven of Reading's commuter lines. Operation Reading commenced in April 1965 and terminated in October 1966.

In 1964, the Southeastern Pennsylvania Transportation Authority ("SEPTA") formed. Incorporated pursuant to the Urban Mass Transportation Law, SEPTA was created as an agency of the Commonwealth of Pennsylvania, although it was subsidized by a number of sources. In November 1965, SEPTA assumed management of SEPACT's programs thereby becoming SEPACT's managing agent.

Reading subsequently went bankrupt and in 1976, pursuant to a final system plan required by the Regional Rail Reorganization Act, conveyed most of its property to Conrail. However, it retained a reversionary interest in certain property. Reading ceased all railroad services on March 31, 1976. When the properties in question reverted back to Reading in 1985, Reading began to clean up the PCB contamination.

*Ownership and operation of Reading Terminal*

Reading constructed the Reading Terminal in 1893 as part of its passenger operations. Part of the Reading Terminal complex was a structure known as the train shed. The train shed contained 13 trackbeds and a number of passenger walkways and loading platforms. Trains would travel in and out of the shed to pick up and deposit passengers.

The train shed, covered by an arched roof supported by steel framing, was completely open at its north end thereby enabling trains to travel in and out of the shed. Reading Terminal Market was situated directly underneath the train shed. Located between the floor of the train shed and the ceiling of the market was an area known as the interstitial space. The interstitial space housed support beams and a stormwater drainage system.

Outside the train shed was an area known as the viaduct. The viaduct was an open, elevated masonry structure that bore tracks of the Ninth Street branch of the Reading Railroad. In order to reach the shed, trains passed over the viaduct.

Between 1893 and April 30, 1976, Reading owned and operated the train shed, including structures associated with that train shed, structural components of the train shed, and interstitial materials lying between the floor of the train shed and the ceiling of Reading Terminal Market. In addition, Reading also owned and operated the viaduct. Proposed Stipulation ¶ A1, Reading Exh. 1.

In 1971, Reading filed for bankruptcy. Congress passed the Regional Rail Reorganization Act in 1973. Under the act, a final system plan was developed and promulgated in 1975. According to the final plan, the operations of a number of bankrupt railroads were melded to create regional rail systems in the northeast and midwest. To that end, the Consolidated Rail Corporation ("Conrail") was created and assets of bankrupt railroads were transferred both to Conrail and to some solvent railroads. *Id.* ¶ A2.

On March 29, 1976, pursuant to the final system plan, Reading conveyed to Conrail an option granting Conrail the right to acquire, on behalf of SEPTA, interests in certain of Reading's property, including the existing track, track structure, supporting structure, and rail operating facilities at the terminal. *Id.* ¶ A7. Conrail exercised its option and on May 3, 1976, conveyed the interest to SEPTA by deed. Reading retained a reversionary interest in the property transferred to Conrail and subsequently to SEPTA. Reading's reversionary interest was to take effect six months after the planned Center City Commuter Tunnel between the former Reading commuter system and the Penn Central commuter system became operational.

From April 1, 1976, until December 31, 1982, Conrail, employing electric railcars

owned by SEPTA, the City, and Reading, operated the passenger rail service at Reading Terminal. *Id.* ¶ B13. From January 1, 1983, until November 11, 1984, SEPTA operated passenger rail service at Reading terminal and utilized electric railcars owned by it and the City.[2] *Id.* ¶ B14. All rail operations at Reading Terminal ceased on November 11, 1984, when the Center City Commuter Tunnel became operational. Since the tunnel linked Reading's former lines and Penn Central's lines north of the Reading Terminal, the terminal became obsolete. On May 12, 1985, six months after rail operations at the terminal ceased, Reading regained ownership of the rail facility, pursuant to the reversionary interest set forth in the 1976 conveyance agreement between it and Conrail.

On November 9, 1990, Reading sold the train shed to the Redevelopment Authority of the City of Philadelphia ("RDA"). On that same date, Reading transferred the Reading Terminal Market to the Pennsylvania Convention Center Authority. Later, on February 14, 1991, Reading sold the viaduct south of Vine Street to the RDA. Reading continues to own the portion of the viaduct north of Vine Street. *Id.* ¶ A14.

*Cause of the PCB contamination*

Overhead catenaries power self-propelled electric railcars. The power propels the cars and provides the energy for auxiliary systems such as heating and lighting. The catenaries on the Reading lines carried 11,000 volt currents of electricity. However, the railcars required lower voltage in order to operate. Each railcar required a transformer to reduce the voltage of the electric current from 11,000 volts to an appropriate level. Report by A.J. Giampaolo on the Operation and Performance of PCB Transformers on Silverliner II and IV Cars at 1, Reading Exh. 5.

As might be expected, transformers generate a sizable amount of heat. Transformers, therefore, contain cooling systems, either blower-driven air or pump-driven liquid. During the pertinent time period, liquid cooling systems contained either mineral oil or PCB based fluids. Because of the dielectric

and fire resistant properties of PCB based fluids, the use of such fluids was favored on railroad equipment. *Id.* at 2.

As a result of the design and normal operation of the equipment, maintenance activity, component failures related to improper or inadequate maintenance, and unforeseen environmental conditions, PCB containing coolant can be emitted from transformers. *Id.* at 6–8.

Reading maintains that railcars owned and operated by defendants released PCBs into the trackbeds during their normal operation. These releases, known as "burps," occurred due to the operation of the transformers' pressure relief valves and safety relief valves. Giampaolo Report at 6, Stickel Deposition at 242, Reading Exh. 120.

In addition to normal releases, Reading also contends that improper or insufficient maintenance caused leaks through cracks, valves, and deteriorating gaskets. Moreover, according to Reading, the improper functioning of component parts of the transformers, such as pumps, also caused leaks. Bahm Deposition at 224, Reading Exh. 122, Giampaolo Report at 5–8, Reading Exh. 5.

Finally, Reading contends that at least two PCB spills occurred at the train shed while Conrail and SEPTA operated the terminal. September 13, 1985 letter from John Jenchura to Eugene Cipriani; February 24, 1984 SEPTA Report, Reading Exh. 7.

*Ownership and operation of PCB-containing railcars*

Railcars equipped with transformers cooled by fluids containing PCBs were first introduced to the Reading system around 1948. Around that time, Reading converted 20 passenger coaches into trailer cars to be used in conjunction with self-propelled electric railcars. The converted trailers housed electric equipment that required the installation of small, auxiliary transformers. These transformers contained PCBs. Reading operated these 20 cars both in the train shed and on the viaduct until sometime prior to

---

**2.** SEPTA's operation was not continuous during this time period due to a strike by rail workers.

Passenger service was suspended between March 15 and July 1, 1983.

April 1, 1976. Proposed Stipulation ¶ B2, Reading Exh. 1.

Around 1949, Reading purchased 8 electric self-propelled railcars equipped with PCB containing main transformers. Reading operated these railcars within the train shed and along the viaduct until the 8 railcars were retired sometime prior to April 1, 1976. *Id.* ¶ B3.

Around 1963, Reading began to operate 17 "Silverliner II" self-propelled electric railcars in the train shed and along the viaduct. These cars were equipped with main transformers cooled by fluids containing PCBs. The City owned the 17 railcars and leased them to Reading pursuant to an agreement dated November 9, 1962. Reading maintained and regularly ran these railcars until March 31, 1976. *Id.* ¶ B4.

Commencing in 1974, Reading operated 14 "Silverliner IV" self-propelled electric railcars. SEPTA owned the 14 railcars and leased them to Reading pursuant to an agreement dated October 11, 1971. Not surprisingly, these cars were also equipped with main transformers cooled by fluids containing PCBs. Reading maintained these railcars and regularly operated them within the train shed and along the viaduct until March 31, 1976. *Id.* ¶ B6.

An additional 88 "Silverliner IV" railcars were ordered for use on Reading's commuter lines. Eight of these cars were delivered in 1975, while the remainder were delivered between 1976 and 1977. These railcars also housed main transformers cooled by fluids containing PCBs. Car numbers 123–182 inclusive were owned by the City. SEPTA owned car numbers 101–122 inclusive and 183–188 inclusive. Reading maintained these railcars and regularly ran them in the train shed and along the viaduct until March 31, 1976. *Id.* ¶ B7.

Around April 30, 1976, Reading executed a bill of sale that conveyed to Conrail passenger railcars owned by Reading. Simultaneously, Reading also conveyed to Conrail its interests in any lease agreements involving railcars. *Id.* ¶¶ B9, B10.

Also on April 30, 1976, SEPTA purchased 172 used commuter railcars, 168 of which were electric, from Conrail. This conveyance included the transfer of 93 passenger railcars originally conveyed by Reading to Conrail. *Id.* ¶ 11.

From April 1, 1976, until December 31, 1982, Conrail operated passenger rail service at Reading Terminal and utilized electric railcars owned by SEPTA, the City, and Reading. Conrail maintained the railcars during this period. *Id.* ¶ 13.

Except during a 108 day strike by rail workers, SEPTA ran passenger service from Reading Terminal between January 1, 1983 and November 11, 1984. SEPTA utilized electric railcars owned by itself and the City. SEPTA maintained the railcars during this period. *Id.* ¶ 14.

*Discovery of contamination and subsequent clean-up operations*

Reading first became aware of PCB contamination in the Reading Terminal in September 1983. In preparation for the reversion of its property, Reading hired Stablex-Reutter, Inc. ("Stablex–Reutter") to test for the presence of PCBs at the terminal and the tracks leading up to the terminal from the viaduct. The testing revealed that PCBs were in fact present. September 20, 1983 Stablex–Reutter Report, SEPTA Exh. 1.

In light of this discovery, in May 1984, Reading's attorney for environmental issues notified the regional administrator of the Environmental Protection Agency's ("EPA") Region III Office and the secretary of the Pennsylvania Department of Environmental Regulation ("DER") of possible PCB contamination. May 31, 1984 letter from David Marston to Nicholas Benedictis and May 31, 1984 letter from David Marston to Thomas Eichler, Reading Exhs. 8, 9. Within these letters, Reading noted its belief that "neither the reorganized Reading Company nor its subsidiaries have any legal responsibility for conditions on the aforesaid sight." *Id.* Moreover, because it was not currently operating the commuter lines, Reading maintained that it was "not in a position to initiate the formal notification or clean-up activities which might otherwise be appropriate in these circumstances." *Id.*

On June 8, 1984, while SEPTA operated passenger service at Reading Terminal, the EPA inspected the Reading Terminal and took samples from thirteen railbeds at the terminal. The EPA's report indicated the existence of "serious PCB problems" at the site. Toxic Substance Control Act Inspection Report at 4, Reading Exh. 10.

On January 28, 1985, Reading informed SEPTA that it had authorized a comprehensive study of the PCB problem and that it expected SEPTA and Conrail to share the costs of the study. January 28, 1985 letter from Richard Kaplinski to Joseph Mack at 2–3, Reading Exh. 12.

In March 1985, the City, through the Philadelphia Industrial Development Corporation ("PDIC"), commissioned an investigation of the PCB problem by WAPORA, Inc. in connection with the proposed Convention Center. March 15, 1985 letter from David Marston to Marilyn Kutler, Chief Deputy City Solicitor, Reading Exh. 13. Instead of conducting its own study, Reading participated jointly with the PDIC in the WAPORA study. *Id.*

Again on March 12, 1985, Reading requested that SEPTA participate in the investigation and cleanup. March 12, 1985 letter from Richard Kaplinski to Joseph Mack, Reading Exh. 14. SEPTA declined to assume any responsibility for the PCB contamination. March 27, 1985, letter from Joseph Keener to Richard Kaplinski, Reading Exh. 16.

Similarly, the City accepted no responsibility for the PCB contamination. March 22, 1985 letter from Gerald Maier to William Hankowsky, Reading Exh. 17. Reading also requested that Conrail become involved in the investigation and clean-up process. Marston Dep. at 70–74, 153–55, Reading Exh. 116. According to Reading's lawyer, David Marston, Conrail maintained that the contamination was SEPTA's concern. *Id.* However, he noted that Conrail stated that if a joint proposal for addressing the PCB contamination were presented to it, it would consider whether it made sense for it to participate in such a joint plan. *Id.* According to Marston, no joint plan was submitted to Conrail because Reading believed that there was insufficient interest in participation

by Conrail to warrant any such efforts. *Id.* Dr. Anthony Moscati, who ran the WAPORA investigation, stated that Conrail flatly refused "to become involved in the investigation and cleanup process." Moscati Dep. II at 82, Reading Exh. 118.

In May 1985, when Reading reacquired ownership of the terminal property, it hired WAPORA to continue investigating and to identify possible clean-up methods. Declaration of Dr. Anthony Moscati ¶ 3, Reading, Exh. 104. In the course of its study, WAPORA determined that PCBs had migrated downward from the floor of the train shed to the interstitial space and finally to the ceiling of Reading Terminal Market. Moscati Declaration ¶ 5, Reading Exh. 104, WAPORA's Final Report on Stabilization of PCB–Bearing Oil Deposits within the Interstitial Space Above the Reading Terminal Market at 1, Reading Exh. 2, Photographs produced at the Deposition of Frank Aceto, Reading Exhs. 80–84.

In June 1985, WAPORA, with EPA approval, stabilized the oily PCB deposits in the southwest corner of the interstitial space and in the market. Moscati Decl. ¶ 11. These stabilization activities included gathering the contaminated material and either landfilling or incinerating it. During December 1985 and January 1986, O.H. Materials ("OHM") conducted similar stabilization activities throughout the interstitial space.

Little or no physical clean-up activities occurred between January 1986 and February 1989. The bulk of Reading's clean-up activities were conducted between February 1989 and February 1991.

In May 1988, Reading entered into an agreement with the RDA to sell part of its property for use in the Convention Center site. Agreement, SEPTA, Exh. 3. The sale price was $32.5 million. A portion of that sum, $3.5 million, was placed in an escrow account to finance the environmental cleanup and to demolish the viaduct. *Id.* at 17. The agreement required Reading to remove PCBs from the terminal facility and to "warrant to RDA, the City and PCCA that all identified contaminants in the train shed have been reduced to levels, acceptable as of

the date hereof, to the United States Environmental Protection Agency." *Id.* at 5. No government agency commenced an enforcement action against Reading to compel it to perform the cleanup.

In November 1985, Reading and WAPORA were informed by Edward Cohen of the EPA that Reading's cleanup should be in compliance with the Toxic Substance Control Act PCB Spill Cleanup Policy. Moscati Decl. ¶ 13, Reading Exhibit 104. Apparently, Reading and WAPORA never dealt with any of the EPA's CERCLA enforcement sections. Although Mr. Cohen was assigned to EPA Region III's TSCA Enforcement Office, he was also the region's designated contact person for those conducting cleanup of Superfund sites with PCB contamination. EPA's Guidance on Remedial Actions for Superfund Sites with PCB Contamination, OSWER Directive N. 9355.401, August 1990 at Appendix E, Reading Exh. 34.

In August 1985, Reading submitted a number of documents to the EPA including the WAPORA Market and I.S. (interstitial space) Study (Reading Exh. 19) and the WAPORA Shed and Viaduct Study (Reading Exh. 3). In 1986, Reading submitted a proposed clean-up plan to the EPA. This plan was entitled the Reading Terminal Viaduct, Shed, and Interstitial Space PCB Contamination Cleanup Plan. Reading, Exh. 37.

In June of 1988, Reading notified the EPA's Mr. Cohen that actual cleanup of the train shed was to begin in accordance with the 1986 WAPORA plan previously submitted to the agency. June 2, 1988 Letter to Edward Cohen, SEPTA, Exh. 11. The EPA requested that Reading make several revisions to its plan. SEPTA, Exhs. 12, 13.

During this period of negotiating with the EPA, Reading began to solicit bids and proposals in connection with the planned cleanup. Reading retained Chester Engineers to oversee the cleanup by Reading's chosen contractor, Remediation, Inc. Reading also entered into contracts with Chemical Waste Management and ENSCO for the transportation and disposal of PCB contaminated materials removed from the Reading facilities.

Finally, on August 16, 1991, the EPA stated that there was no indication of "need for further decontamination" at the present time. Letter from John Ruggero, Chief TSCA Enforcement and TRI Section, Reading Exh. 25. However, the EPA did "not waive any of its enforcement rights under any statute in relation to the PCB cleanup at this site." *Id.*

Reading still owns the portion of the viaduct north of Vine Street. PCBs remain in that portion of the viaduct.

## II. CERCLA Claims

CERCLA permits private parties to bring cost recovery suits against statutorily defined responsible parties for the costs that they have incurred in cleaning up hazardous substances. 42 U.S.C.A. § 9607(a)(4)(B); *Philadelphia v. Stepan Chem. Co.*, 544 F.Supp. 1135 (E.D.Pa.1982).

In order to make out a cost recovery claim under § 9607(a)(4)(B)[3], a plaintiff must

---

3. **§ 9607 Liability**
   **(a) Covered persons; scope; recoverable costs and damages; interest rate; "comparable maturity" date**
   Notwithstanding any other provision or rule or law, and subject only to the defenses set forth in subsection (b) of this section—
   (1) the owner and operator of a vessel or a facility,
   (2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,
   (3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or

incineration vessel owned or operated by another party or entity and containing such hazardous substances, and
   (4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the occurrence of response costs, of a hazardous substance, shall be liable for—
   (A) all costs of removal or remedial action incurred by the United States Government or a State or an Indian tribe not inconsistent with the national contingency plan;
   (B) any other necessary costs of response incurred by any other person consistent with the national contingency plan;
   (C) damages for injury to, destruction of, or loss of natural resources, including the reason-

prove the following elements: (1) the defendant comes within one of the four classes of "covered persons" identified in § 9607(a)(2), (2) there is a release or threatened release of hazardous substances from a facility, (3) the release or threatened release caused the plaintiff to incur response costs, (4) the costs incurred were the necessary costs of response, and (5) the response costs incurred were consistent with the national contingency plan. 42 U.S.C.A. § 9607(a), *Artesian Water Co. v. Government of New Castle County,* 659 F.Supp. 1269, 1278 (D.Del.1987), *aff'd* 851 F.2d 643 (3d Cir.1988). Section 9601 defines many of the terms used above. 42 U.S.C.A. § 9601.

■ If a party is determined to be a responsible party and the other required elements are present, then liability is strictly imposed. *U.S. v. Alcan Aluminum Corp.,* 964 F.2d 252, 259 (3d Cir.1992); *Dedham Water Co. v. Cumberland Farms Dairy, Inc.,* 889 F.2d 1146, 1150 (1st Cir.1989); *New York v. Shore Realty Corp.,* 759 F.2d 1032, 1042 (2nd Cir.1985).

### III. Standard for Granting Summary Judgment

Summary judgment is appropriate if there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Small v. Seldows Stationery,* 617 F.2d 992, 994 (3d Cir.1980). The court does not resolve questions of disputed fact, but simply decides whether there is a genuine issue of fact which must be resolved at trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Ettinger v. Johnson,* 556 F.2d 692 (3d Cir.1977). The facts must be viewed in the light most favorable to the opposing party, and reasonable doubt as to the existence of a genuine issue of material fact is to be resolved against the moving party. *Continental Insurance Co. v. Bodie,* 682 F.2d 436, 438 (3d Cir.1982). However, "there is no issue for trial unless there is

able costs of assessing such injury, destruction, or loss resulting from such a release; and
**(D)** the costs of any health assessment or health effects study carried out under section 9604(i) of this title.

sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249–50, 106 S.Ct. at 2510–11 (citations omitted). The inquiry is whether the evidence presents a sufficient disagreement to require submission to the jury, or whether it is so one-sided that one party must prevail as a matter of law. *Id.* at 252, 106 S.Ct. at 2512.

### IV. Relationship Between CERCLA and TSCA

SEPTA makes a number of arguments related to the Toxic Substance Control Act ("TSCA"), 15 U.S.C.A. §§ 2601–2671 (West 1982 & 1993 Supp.). In order to evaluate these arguments, the court will briefly summarize the portions of TSCA pertinent to this motion.

Congress passed TSCA in 1976, four years before CERCLA's passage in 1980. The purpose of the legislation was to "regulate chemical substances and mixtures which present an unreasonable risk of injury to health or the environment, and to take action with respect to chemical substances and mixtures which are imminent hazards." 15 U.S.C.A. § 2601(b)(2). In that vein, the statute outlawed the manufacture, processing, distribution, or use of PCBs "in any manner other than in a totally enclosed manner." 15 U.S.C.A. § 2605(e)(2)(A). However, TSCA also authorized the EPA to issue a rule allowing the manufacture, processing, distribution, or use of PCBs in other than a totally enclosed manner if the EPA found that the activity in question did not "present an unreasonable risk of injury to health or the environment." 15 U.S.C.A. § 2605(e)(2)(B).

Pursuant to this statutory authority, the EPA issued a rule authorizing, subject to certain conditions, the use of PCBs in railroad transformers. The Code of Federal Regulations states:

42 U.S.C.A. § 9607(a) (West Supp.1993).

PCBs may be used in transformers in railroad locomotives or railroad self propelled cars ('railroad transformers') and may be processed and distributed in commerce for purposes of servicing these transformers in a manner other than a totally enclosed manner subject to the following conditions.

40 C.F.R. § 761.30(b) (1991). Furthermore, the EPA recognized that spills and leaks of PCBs were incidental to the use of such transformers:

> Through normal operation of railroad cars, certain concentrations of PCBs in dielectric fluid are frequently spilled onto railroad beds. These spills can occur as a result of overheating or electrical failure in the transformers and of damage to these transformers from rocks and debris on the railroad bed.

48 Fed.Reg. 124 (1983).

TSCA does contain enforcement provisions. However, TSCA, unlike CERCLA, does not create a private right of action authorizing a private party to recover response costs from other responsible parties.

In an attempt to ward off the potential imposition of CERCLA liability, SEPTA talismanically cites TSCA throughout its papers. The attempt fails.

*CERCLA liability may be imposed for activity authorized under TSCA*

■ SEPTA contends that the EPA's authorization, pursuant to TSCA, of the use of PCB containing transformers on railcars insulates it from CERCLA liability. The court disagrees.

No conflict exists between the two statutory schemes. CERCLA, the later of the two statutes, expressly states that liability under the statute may be imposed upon a covered person "[n]otwithstanding any other provision or rule of law, and subject only to the defenses set forth in subsection (b) of this section." 42 U.S.C.A. § 9607(a). This statutory language indisputably evidences Congress' intention to prohibit implied exclusions from or exceptions to CERCLA liability.

Courts considering whether another environmental statute, the Resource Conservation and Recovery Act ("RCRA"), creates an exception to CERCLA liability have concluded that it does not. *See, e.g., Accord Mardan Corp. v. C.G.C. Music, Ltd.*, 600 F.Supp. 1049, 1054 (D.Ariz.1984), *aff'd*, 804 F.2d 1454 (9th Cir.1986) ("That CERCLA was intended to operate independently of and in addition to RCRA is indicated by the first clause of Section 107 of CERCLA which provides 'Notwithstanding any other provision or rule of law ... [liability may be established].' "); *United States v. Rohm and Haas Co.*, 790 F.Supp. 1255, 1262 (E.D.Pa.1992) ("The overwhelming evidence is that Congress intended CERCLA to be cumulative and not merely an' alternative to RCRA.... There is no statutory expression that would prevent EPA from recovering costs incurred in supervising a so-called RCRA managed site.... Without a clear statutory statement to the contrary, this CERCLA remedy must be upheld as an available tool of environmental protection. The defense of an implied exclusion of CERCLA remedies, must, therefore, be rejected.")

*A cleanup conducted under the auspices of TSCA does not automatically preclude recovery under CERCLA*

■ SEPTA again invokes TSCA. It maintains that since Reading proceeded with their cleanup under TSCA guidelines and under the supervision of the EPA Region III's TSCA Enforcement Section, Reading cannot assert a CERCLA cause of action to recover some of its costs.

SEPTA misses the point. The relevant inquiry is whether Reading conducted a cleanup comporting with CERCLA requirements, regardless of whether the cleanup also complied with TSCA standards.

In fact, the EPA has stated that cleanups under other environmental statutes may serve as the basis of a CERCLA suit. The agency explained:

> Of course, even if a party takes a cleanup action under an authority other than CERCLA (e.g. RCRA corrective action), it may have a right of cost recovery under CERCLA section 107 if the action was a necessary response to a release of hazardous substances, and was performed consistent with the N.C.P. [national contingency plan]

55 Fed.Reg. 8796 (1990). As the Third Circuit has noted, "EPA's interpretation of a statute [CERCLA] it is charged with enforcing is entitled to considerable deference, and must be adhered to where it is reasonable and consistent with the language of the statute." *U.S. v. Alcan Aluminum Corp.*, 964 F.2d 252, 226–63 (3d Cir.1992).

Moreover, CERCLA does not provide clean-up standards. SEPTA's own expert witness, Dr. Louis Fournier, stated:

> Q. Does CERCLA contain cleanup standards?
>
> A. I think they refer to cleanup standards. They refer to other bodies of legislation—
>
> Q. It's fair to say that CERCLA itself does not contain any cleanup standards; isn't that right?
>
> A. I don't think there's [sic] any standards per se. They refer to other pieces of legislation.
>
> Q. It's fair to say that under CERCLA that the statute directs someone who is attempting to determine cleanup standards to other bodies of law outside the four corners of the CERCLA statute itself; isn't that right?
>
> A. I think that's fair.

Fournier Deposition at 112, Reading Exh. 111.

In fact, an EPA publication entitled "Guidance on Remedial Actions for Superfund Sites with PCB Contamination" states that "[p]rimary Federal ARARs [Applicable or Relevant and Appropriate Requirements] for PCBs derive from the Toxic Substances Control Act (TSCA) and the Resource Conservation and Recovery Act (RCRA)." Guidance at iii, Reading Exh. 34.

As indicated by the evidence set forth above, it was neither unusual nor inappropriate for Reading to follow TSCA guidelines.

## V. *Federally permitted releases and the exhaust exception*

Next, SEPTA argues that although fluids containing PCBs may have been emitted from the railcars, CERCLA liability cannot be imposed for the releases. Specifically, SEPTA contends that the releases were either federally permitted releases or fall within CERCLA's exemption for emissions from engine exhaust. The court rejects both arguments advanced by SEPTA.

*The release of PCBs from railcars does not constitute a federally permitted release as defined by CERCLA*

■ SEPTA argues that the release of PCBs from the transformers constituted a federally permitted release. Therefore, it claims that CERCLA prohibits Reading from seeking response costs in connection with such a release.

CERCLA does prohibit the recovery of response costs to a federally permitted release. Section 9607(j) states that "recovery by any person ... for response costs or damages resulting from a federally permitted release shall be pursuant to existing law in lieu of this section." 42 U.S.C.A. § 9607(j). The statute also defines the term "federally permitted release." The pertinent portion of that definition states:

> The term 'federally permitted release' means ... (E) releases in compliance with a legally enforceable final permit issued pursuant to section 3005(a) through (d) of the Solid Waste Disposal Act [42 U.S.C.A. § 6925(a) to (d) ] from a hazardous waste treatment, storage, or disposal facility when such permit specifically identifies the hazardous substances and makes such substances subject to a standard of practice, control procedure or bioassay limitation or condition, or other control on the hazardous substances in such releases, ...

42 U.S.C.A. § 9601(10). According to this statutory provision, releases in compliance with a final permit issued under the Solid Waste Disposal Act ("SWDA") do not constitute releases under CERCLA.

SEPTA reasons as follows. Under EPA regulations, electrical equipment used in a non-totally enclosed manner pursuant to procedures set forth in TSCA remain exempt from the permit requirements of SWDA. *See,* 40 C.F.R. § 261.8 (1991). Moreover, TSCA regulations authorize the use of PCB-containing railcar transformers subject to a standard of practice and control procedure thereby, according to SEPTA, authorizing

the PCB contamination incidental to such use. *See*, 40 C.F.R. § 761.30(b) (1991). SEPTA concludes that the TSCA regulation allowing the use of railcar transformers in a non-totally enclosed manner is "substantially equivalent" to a permit to release issued pursuant to SWDA and thus falls within the ambit of § 9607(j).

SEPTA's argument lacks merit. Neither CERCLA's language nor its legislative history supports SEPTA's contention that compliance with TSCA is tantamount to a final permit issued under SWDA.

Section 9607(10) defines "federally permitted release" in an extraordinarily detailed manner.[4] SEPTA attempts to squeeze itself into the parameters of part (E) of the statutory definition by arguing that the fact that TSCA exempts transformers from the permit requirements of SWDA is somehow tantamount to holding a final permit under SWDA.

Clearly, the language of § 9601(10)(E) addresses only those releases made pursuant to

a final permit. SEPTA admits that it did not possess a legally enforceable final permit issued pursuant to SWDA. This court sees no justification for flouting the clear language of 9601(10)(E) which discusses only releases made pursuant to a final permit. If Congress had desired to include uses exempt from SWDA requirements in its definition of federally permitted releases, it could have done so. There can be no doubt that the plain wording of this statutory provision does not cover releases made without a final permit.

Finally, CERCLA's legislative history supports the conclusion that § 9601(10)(E) means precisely what it says. A Senate Committee Report discusses Section 2(b)(18) of a Senate bill, eventually enacted, in substantially the same form, as § 9601(10)(E) of CERCLA. The report states:

Subparagraph (E) of the definition addresses permits issued under Section 3005 (Permits for Treatment, Storage or Disposal of Hazardous Waste) of the Solid

---

4. 42 U.S.C.A. § 9601(10) states:

The term 'federally permitted release' means (A) discharges in compliance with a permit under section 1342 of Title 33, (B) discharges resulting from circumstances identified and reviewed and made part of the public record with respect to a permit issued or modified under section 1342 of Title 33 and subject to a condition of such permit, (C) continuous or anticipated intermittent discharges from a point source, identified in a permit or permit application under section 1342 of Title 33, which are caused by events occurring within the scope of relevant operating or treatment systems, (D) discharges in compliance with a legally enforceable permit under section 1344 of Title 33, (E) releases in compliance with legally enforceable final permit issued pursuant to section 3005(a) through (d) of the Solid Waste Disposal Act [42 U.S.C.A. § 6925(a) to (d) ] from a hazardous waste treatment, storage, or disposal facility when such permit specifically identifies the hazardous substances and makes such substances subject to a standard of practice, control procedure or bioassay limitation or condition, or other control on the hazardous substances in such releases, (F) any release in compliance with a legally enforceable permit issued under section 1412 of Title 33 of 4. section 1412 of Title 33 [sic], (G) any injection of fluids authorized under Federal underground injection control programs or State programs submitted for Federal approval (and not disapproved by the Administrator of the Environmental Protection Agency) pursu-

ant to Part C of the Safe Drinking Water Act [42 U.S.C.A. § 300h et seq.], (H) any emission into the air subject to permit or control regulation under section 111 [42 U.S.C.A. § 7411], section 112 [42 U.S.C.A. § 7412], Title I part C [42 U.S.C.A. § 7470 et seq.], Title I part D [42 U.S.C.A. § 7501 et seq.], or State implementation plans submitted in accordance with section 110 of the Clean Air Act [42 U.S.C.A. § 7410] (and not disapproved by the Administrator of the Environmental Protection Agency), including any schedule or waiver granted, promulgated, or approved under these sections, (I) any injection of fluids or other materials authorized under applicable State law (i) for the purpose of stimulating or treating wells for the production of crude oil, natural gas, or water, (ii) for the purpose of secondary, tertiary, or other enhanced recovery of crude oil or natural gas, or (iii) which are brought to the surface in conjunction with the production of crude oil or natural gas and which are reinjected, (J) the introduction of any pollutant into a publicly owned treatment works when such pollutant is specified in and in compliance with applicable pretreatment standards of section 1317(b) or (c) of Title 33, and (K) any release of source, special nuclear, or byproduct material, as those terms are defined in the Atomic Energy Act of 1954 [42 U.S.C.A. § 2011 et seq.], in compliance with legally enforceable license, permit, regulation, or order issued pursuant to the Atomic Energy Act of 1954.

Waste Disposal Act. The reported bill tightly limits the types of disposal site releases that would be covered by this definition. First, only final permits are included. Sites or facilities which have interim status under Section 3005(e) do not adequately utilize acceptable levels of technology, and do not qualify for this exclusion. Second, to be covered by this portion of the definition, the permit applicant must specify the hazardous substance to be released and agree to controls on such releases. For example, this subparagraph would not cover permits where the permittee has built a disposal site to a design standard but for some reason it leaks a hazardous substance. For such a situation to utilize the exemption under this section the permittee would have had to designate these releases and made them subject to a standard of practice, control procedure or bioassay limitation or condition, or other control.

S.Rep. No. 96–848, 96th Cong., 2nd Sess. (1980), published in a Legislative History of CERCLA, Congressional Research Service, vol. 1 at 355. Reading Exh. 61.

*Engine exhaust exception*

■ SEPTA once again attempts to force a square peg into a round hole by arguing that the leaking of PCBs falls within the engine exhaust exception to CERCLA. CERCLA does exclude "emissions from the engine exhaust of a motor vehicle, rolling stock, aircraft, vessel, or pipeline pumping station engine" from its definition of releases actionable under the statute. 42 U.S.C.A. § 9601(22).

However, SEPTA maintains that although the emission of dielectric fluid from a transformer "may not be in the purest technical sense an emission from an electric train's engine exhaust," the exhaust exception illus-

trates Congress' intention that CERCLA liability not be imposed for "the emissions of fluids necessary and integral to the normal operation of a vehicle." Clearly, an emission from a railcar's transformer is not in any sense an emission from a railcar's engine exhaust. Once again, this court finds no basis for departing from CERCLA's unclouded language.

### VI. Consumer Product Exception

SEPTA argues that Reading cannot establish that it incurred response costs resulting from a release of hazardous substances from a facility as required by 42 U.S.C.A. § 9607(a)(4). It contends that the electric railcars fall within the consumer product exception of CERCLA.[5] The statute specifically excludes from the definition of facility "any consumer product in consumer use." 42 U.S.C.A. § 9601(9).

At the same time, CERCLA also expressly includes rolling stock in its definition of facilities. 42 U.S.C.A. § 9601(9). Since the definition of facility specifically mentions rolling stock, there must be a strong presumption in favor of the conclusion that railcars are not consumer products in consumer use.

■ CERCLA fails to define either consumer product or consumer use. Therefore, the court must apply rules of statutory construction to interpret the phrase "a consumer product in consumer use."

The Supreme Court has noted:

We begin with the familiar canon of statutory construction that the starting point for interpreting a statute is the language of the statute itself. Absent a clear expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive.

---

**5.** Interestingly, in other litigation in the Eastern District of Pennsylvania, SEPTA asserted that CERCLA did in fact encompass the release of fluids containing PCBs from railcar transformers. The United States sued SEPTA under CERCLA and TSCA to recover its response costs incurred in removing PCBs from the Paoli Railyard. *See, United States v. SEPTA,* Civ. Action No. 86–1904 (E.D.Pa.) Complaint ¶¶ 6, 11–12, Reading Exh. 70. SEPTA, in turn, filed a third-

party complaint against the manufacturers of the transformers and railcars seeking contribution for its CERCLA liability. In its complaint, SEPTA asserted that defendants were liable for the cleanup of an "allegedly hazardous substance [that] was released within the meaning of CERCLA ... in among other ways, the normal course of operation of the rail vehicles and transformers." Complaint ¶ 68, Reading Exh. 69.

*Consumer Product Safety Com. v. GTE Sylvania, Inc.*, 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980). Furthermore, when considering the meaning of a statutory phrase, a court must consider not only the ordinary meaning of the words but also the meaning of the words in light of the purposes, context, and structure of the entire statute of which the phrase is a part. *American Mining Congress v. U.S. E.P.A.*, 824 F.2d 1177, 1184–85 (D.C.Cir.1987).

▇▇ With the above canons of statutory construction in mind, the court will analyze the meaning of the term consumer product in consumer use.

Black's Law Dictionary 317 (6th ed. 1990) defines consumer product:

> Any tangible personal property which is distributed in commerce and which is normally used for personal, family, or household purposes....

A look at the definition provided in the Consumer Product Safety Act, a statute in place at the time of CERCLA's passage in 1980, is also instructive. That act defines the term consumer product as:

> any article, or component part thereof, produced or distributed (i) for sale to a consumer for use in or around a permanent or temporary household or residence, a school, in recreation, or otherwise, or (ii) for the personal use, consumption or enjoyment of a consumer in or around a permanent or temporary household or residence, a school, in recreation, or otherwise.

15 U.S.C.A. § 2052(a) (West 1982).

The general goals of CERCLA, as well as the legislative history of the statute, provide further support for the obvious conclusion that an entity operating commuter train service does not operate the railcars as consumer products in consumer use. CERCLA's legislative history indicates that the consumer products exception was meant to cover individual consumers.

On September 18, 1980, during floor debate on the bill Senator Cannon voiced his concern that the bill, as written, could impose liability on individual consumers. He stated:

S. 1480 contains no exclusion for consumer products. Therefore, it has been suggested that this would mean that an individual consumer is subject to strict, joint, and several liability for a 'release' from any product that contains one of the numerous hazardous substances listed on pages 24 to 28 of the Senate Environment and Public Works Committee report. While staff has been informed that such a result was not intended, the term 'facility' as it is presently defined would include consumer products, and the report does not in any way clarify that this term does not include consumer products. An amendment will be offered to clarify this matter.

126 Cong.Rec. S12916–23 (daily ed. Sept. 18, 1980) (statement of Sen. Cannon), Reading, Exh. 64.

Following this initial expression of concern, Senator Cannon did in fact offer an amendment that became part of § 9601(9), coined the "consumer products exception." Senator Cannon made the following remarks when explaining this amendment:

> [O]ne of my amendments would exclude consumer products from the definition of 'facility,' thus precluding any unintended application of notification requirements and liability provisions to consumers.

S. 1480 Amendments No. 2374 through 2388, remarks of Senator Cannon (Sept. 24, 1990) (Cong. Research Serv. Vol. 3, p. 178–179), Reading Exh. 62.

Furthermore, a senate report, on the Superfund Amendments and Reauthorization Act ("SARA") which amended CERCLA, reinforces the inescapable conclusion that the term consumer products in consumer use means what one would ordinarily expect it to mean. When discussing an amendment requiring the inventory of hazardous substances by owners and operators of facilities, the report touched upon the subject of the consumer products exception. The report stated:

> This use of the mixture rule in the definition of 'hazardous substance' does not extend the coverage of this amendment to finished consumer products such as those that might be found in a retail store, where such products do not present a threat of a

release from a facility. This is consistent with the definition of a 'facility' contained in existing section 101(9) of CERCLA, and its reference to consumer products.

S.Rep. No. 11, 99th Cong., 1st Sess. 11 (1985).

SEPTA cites a number of cases as supporting its contention that the railcars should be considered as consumer products falling outside CERCLA's scope. The court finds these cases to be inapposite to the facts at hand.

SEPTA theorizes that the consumer products exception insulates from liability "those who engage in productive activities." In support of its theory, SEPTA cites a Fifth Circuit case, *Dayton Indep. School Dist. v. United States Mineral Products Co.*, 906 F.2d 1059 (5th Cir.1990). In that case, the Fifth Circuit found that building materials containing asbestos constituted consumer products. *Id.* at 1065. In response to the argument that the facilities at issue were the buildings containing the asbestos building materials, the Fifth Circuit stated:

> The provision exempting consumer products obviously was meant to protect from liability those who engage in production activities with a useful purpose, as opposed to those engaged in the disposal of hazardous substances. It is clear that Congress did not intend CERCLA to target legitimate manufacturers or sellers of useful products. Rather, taken in context, the provision reflects Congress' desire to hold liable those who would attempt to dispose of hazardous wastes or substances under various deceptive guises in order to escape liability for their disposal.

> The legislative history reinforces appellant's argument that Congress intended to provide recovery only for releases or threatened releases from inactive or abandoned waste sites, not releases from useful consumer products in the structure of the buildings. The sale of asbestos-containing products for useful consumption is not the 'arranging for disposal' of a hazardous substance at a 'facility,' Section 107(a) of

CERCLA, that the statute is designed to combat.

*Id.* at 1065–66.

Several features of the *Dayton* case cause the court to conclude that it is not particularly helpful in analyzing the case presently before the court.

First, the Fifth Circuit concluded that "building materials are without a doubt consumer products." *Id.* at 1065. The only reason given for this conclusion is that "[t]he provision exempting consumer products obviously was meant to protect from liability those who engage in production activities [manufacturers and sellers of useful products] with a useful purpose...." *Id.* The Ninth Circuit has reached the opposite conclusion with respect to asbestos containing building materials by holding that "structures containing asbestos building material as distinguished, for example, from containers of such materials for consumer use, satisfy the broad definition of 'facility' in CERCLA section 101(9)." *California v. Blech*, 976 F.2d 525, 527 n. 1 (9th Cir.1992).

Second, in *Dayton*, the plaintiff was attempting to impose arranger liability on the manufacturer of asbestos-containing building materials. Courts have universally concluded that asbestos removal from buildings does not fall within CERCLA's ambit. Courts have offered two major reasons why the costs of removal of asbestos containing building materials cannot be recovered under CERCLA. First, courts have cited the sheer magnitude of the liability involved. The Fourth Circuit explained:

> To extend CERCLA's strict liability scheme to all past and present owners of buildings containing asbestos as well as to all persons who manufactured, transported, and installed asbestos products into buildings, would be to shift literally billions of dollars of removal cost liability based on nothing more than an improvident interpretation of a statute that Congress never intended to apply in this context.

*First United Methodist Church v. U.S. Gypsum Co.*, 882 F.2d 862, 869 (4th Cir.1989). Courts have also relied upon 42 U.S.C.A. § 9604(a)(3) in reaching the conclusion that

CERCLA does not cover asbestos removal from buildings. Section 9604(a)(3) states:

> The President shall not provide for a removal or remedial action under this section in response to a release or threat of release—
>
> (B) from products which are part of the structure of, and result in exposure within, residential buildings or business or community structures.

42 U.S.C.A. § 9604(a)(3). Although typically under CERCLA private parties seeking to recover response costs are not bound by the restrictions specifically placed on actions brought by the government, courts have found the above statutory provision to be indicative of Congress' intention that all parties be prohibited from seeking recovery for the costs of removing of asbestos from within a building. *See, First United Methodist Church*, 882 F.2d at 867–68; *3550 Stevens Creek Assoc. v. Barclays Bank of California*, 915 F.2d 1355, 1362–65 (9th Cir.1990).

SEPTA also relies upon *Electric Power Bd. v. Westinghouse Electric Corp.*, 716 F.Supp. 1069 (E.D.Tenn.1988). In that case, the plaintiff sought to impose CERCLA liability on the manufacturer of electrical transformers that leaked dielectric fluid containing PCBs and the manufacturer of the dielectric fluid. The transformers at issue were located in a commercial building. Without providing any reasoning, the court concluded that transformers containing dielectric fluid were consumer products in consumer use and therefore did not qualify as facilities. This court is not persuaded.

SEPTA also suggests that because consumers used the Reading Terminal complex, the entire area should be considered a consumer product. Taken to its logical conclusion, this argument becomes absurd.

Under this rationale, things defined as facilities by CERCLA, such as buildings, motor vehicles, and aircraft would be transformed into consumer products in consumer use, simply by virtue of the fact that people use them. A federal district court, rejecting the same argument, explained:

> If the court were to accept [defendant's] definition of a facility, any commercial building or property that could be bought or sold would have to be classified as a consumer product if the property is used by the general public. This would effectively exclude all private actions against previous landowners, despite the fact that section 9607 clearly provides for such actions.

*CP Holdings, Inc. v. Goldberg–Zoino & Assoc., Inc.*, 769 F.Supp. 432, 439 (D.N.H.1991).

## VII. Disposal of Hazardous Substances under CERCLA

SEPTA maintains that it cannot be a covered person under § 9607(a)(2) because no disposal of hazardous substances occurred at the time that SEPTA owned or operated the train shed. Section 9607(a)(2) imposes liability upon "any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of." 42 U.S.C.A. § 9607(a)(2).

■ According to SEPTA, the use of dielectric fluid containing PCBs in railroad transformers does not, as a matter of law, constitute a disposal of hazardous substances within the meaning of CERCLA. The term disposal, according to SEPTA, includes only an affirmative act of discarding a substance as waste, not the productive use of a substance. At the heart of SEPTA's argument lies the notion that unintended or incidental discharges of hazardous substances that occur as a side effect of a productive use of these substances do not qualify as disposals under CERCLA. The court disagrees with SEPTA's conclusion.

CERCLA adopts the definition of disposal set forth in the SWDA. 42 U.S.C.A. § 9601(29). SWDA defines disposal as:

> [t]he discharge, deposit, injection, dumping, spilling, leaking, or placing of any *solid waste or hazardous waste* into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters.

42 U.S.C.A. § 6903(3) (West 1983) (emphasis added). SWDA, in turn, also defines the

terms hazardous waste and solid waste. The statute explains the term hazardous waste:

a solid waste, or combination of solid wastes, which because of its quantity, concentration, or physical, chemical, or infectious characteristics may—

(A) cause, or significantly contribute to an increase in mortality or an increase in serious irreversible, or incapacitating reversible, illness or

(B) pose a substantial present or potential hazard to human health or the environment when improperly treated, stored, transported, or disposed of, or otherwise managed.

42 U.S.C.A. § 6903(5). Clearly then, hazardous wastes are a subset of solid wastes. Solid waste is defined as:

any garbage, refuse, sludge from a waste treatment plant, water supply treatment plant, or air pollution control facility and other discarded material, including solid, liquid, semisolid, or contained gaseous material resulting from industrial, commercial, mining, and agricultural operations, and from community activities.

42 U.S.C.A. § 6903(27).

The definition of disposal encompasses leaks and spills of solid waste. Solid waste includes discarded liquid material resulting from industrial or commercial operations. Leaks and spills of liquids containing PCBs from the electrical transformers of railcars would appear to fit the definitions provided. The only possible question can be the meaning of the word discarded.

The EPA defines the term discarded material. According to 40 C.F.R. § 261.2(a)(2) (1991), discarded material includes any material which is "abandoned, recycled, or inherently wastelike." Further, the regulations

define abandoned as "disposed of, burned or incinerated, or accumulated, stored or treated (but not recycled) before or in lieu of being abandoned by being disposed of, burned or incinerated." 40 C.F.R. § 261.2(b) (1991). The regulations then, bring us back full circle to the meaning of the term disposal.

Clearly, the court must look at other sources to determine the meaning of discarded. Webster's Ninth New Collegiate Dictionary 360 (1990) defines discard as "to get rid of especially as useless or unpleasant, the letting go or throwing way of something that has become useless or superfluous." A look at the legislative history of the phrase discarded material also proves fruitful. A house committee report stated:

Not only solid wastes, but also liquid and contained gaseous wastes, semi-solid wastes and sludges are the subjects of this legislation. Waste itself is a misleading word in the context of the committee's activity. Much industrial and agricultural waste is reclaimed or put to a new use and is therefore not a part of the discarded materials disposal problem the committee addresses.

H.R.Rep. No. 1491, 94th Cong.2d Sess at 2, U.S.Code Cong. & Admin.News 1976, pp. 6238, 6240.

According to the sources cited above, it appears that waste created by an "industrial" process that is not reclaimed or put to another use should be considered discarded.[6] Fluids that leak and spill from railcar transformers onto the ground underneath cannot be considered as anything but discarded. A number of cases support this conclusion. *See, American Mining Congress v. U.S. E.P.A.,* 824 F.2d 1177, 1192–93 (D.C.Cir.

---

**6.** SEPTA claims that, according to the Code of Federal Regulations, the term discarded material does not include materials which are "used or reused as ingredients in an industrial process to make a product." SEPTA's Brief 60. Although it quotes correctly from the regulation, it fails to note the context of the quote. The Code of Federal Regulations states:

(e) **Materials that are not solid waste when recycled.** (1) Materials are not solid wastes when they can be shown to be recycled by being:

(i) Used or reused as ingredients in an industrial process to make a product, provided the materials are not being reclaimed....

40 C.F.R. § 261.2(e). To the court's knowledge, no party to the litigation claims that the PCBs released from the transformers were used or reused as ingredients in an industrial process to make a product. Therefore, the court finds this regulation to be irrelevant to the case at hand.

1987) (Congress used the term discarded in its "ordinary, everyday sense." "Congress clearly and unambiguously expressed its intent that 'solid waste' ... be limited to materials that are 'discarded' by virtue of being disposed of, abandoned, or thrown away." Court holds that "materials no longer useful in their original capacity though destined for immediate reuse in another phase of the industry's ongoing production process" are not discarded.); *Connecticut Coastal Fishermen's Assoc. v. Remington Arms Co.*, 777 F.Supp. 173, 193–94 (D.Conn.1991), *aff'd in part and rev'd in part*, 989 F.2d 1305 (2nd Cir.1993) ("shooting targets is an act of discarding lead shot, target debris and spent cartridges.... Thus, the act of shooting the gun becomes the act of discarding, since the waste is not easily accessible to be disposed of thereafter.... Lead shot and target debris fit easily within the plain-English meaning of 'discarded.' There is never an attempt to reuse these materials ... they are totally abandoned.").

There is a huge distinction between the use of dielectric fluid within transformers and the expulsion of portions of this fluid from transformers into the environment. How this emission of fluids can be characterized as other than the discarding or disposal of waste remains a puzzle to the court.

SEPTA relies heavily on a Ninth Circuit case, *3550 Stevens Creek Assoc. v. Barclays Bank of California*, 915 F.2d 1355 (9th Cir. 1990). The facts of that case are as follows. First Valley Corporation constructed a building containing asbestos insulation and fire retardants. Later, Barclays Bank took over First Valley's assets, including the building in question. Barclays, in turn, sold the property to Stevens Creek. In the process of remodeling the building, Stevens Creek was forced to remove asbestos. Stevens Creek sued Barclays under CERCLA to recover the costs of the asbestos removal.

The Ninth Circuit found that no disposal had occurred. The court stated:

> On its face 'disposal' pertains to 'solid waste or hazardous waste,' not to building materials which are neither. There is no suggestion that Barclays or its predecessors-in-interest discarded asbestos insula-

tion and fire retardants; rather they were used to construct the building.

*Id.* at 1361. Furthermore, the Ninth Circuit adopted a definition of disposal "referring only to an affirmative act of discarding a substance as waste, and not to the productive use of the substance." *Id.* at 1362. The Ninth Circuit concluded that:

> Because the definition [of disposal] applicable to actions under § 107(a)(2) and (a)(3) is the same, and there is no meaningful difference for purposes of CERCLA between a party who sells or transports a product containing or composed of hazardous substances for a productive use, and a party who actually puts that product to its constructive use, we see no reason to adopt a different definition in this case.

*Id.*

There is an important distinction between productive uses of hazardous materials in which there is no contemporaneous waste creation and those productive uses in which the creation of wastes is an integral and inherent part of the productive use. A recent California district court case decided in the wake of *Stevens Creek* recognized this distinction. In *Levin Metals Corp. v. Parr-Richmond Terminal Co.*, 781 F.Supp. 1448 (N.D.Cal.1991), the facts were as follows. The Montrose Chemical Corporation of America and the Stauffer Chemical Company paid certain companies to grind and mix their chemicals into pesticides according to their specifications. Portions of the chemicals were used during the formulation process while some of the chemicals became waste. Montrose claimed that it had nothing to do with the conversion of useful chemicals into waste. The district court disagreed:

> [T]he court will not permit semantic games to obfuscate the true questions at issue and defeat the purposes of CERCLA. At issue here is not the DDT that was put to productive use, but rather the DDT that was released into the environment. The 'disposal' alleged refers only to the released DDT.

*Id.* at 1452.

Since the uncontained discharge of dielectric fluid containing PCBs was inherent to

the operation of the transformers and hence the railcars, the discarding of wastes was inherent to the operation of the railcars. When the disposal of waste is inherent to the productive use of a substance, an "affirmative act" of disposal occurs every time the productive use occurs.

To hold that no waste was disposed or discarded on the facts of this case would be tantamount to grafting an intent requirement onto CERCLA. Courts have consistently held that liability under the statute is strict. Given that baseline, the court finds it difficult to conceive how the leaks and spills of dielectric fluid that occurred due to the operation of the railcars could be considered as anything other than a disposal.

## VIII. Release into the Environment

■ SEPTA claims that the spilling and leaking of fluids from the railcar transformers did not, as a matter of law, constitute a release or threatened release into the environment. The court rejects this conclusion.

CERCLA imposes liability on a former owner or operator of a facility or an arranger for the disposal of wastes at a facility "from which there is a release or threatened release ... of a hazardous substance." 42 U.S.C.A. § 9607(a). A release, by definition, must occur "into the environment." 42 U.S.C.A. § 9601(22). CERCLA defines environment as:

(A) the navigable waters, the waters of the contiguous zone, and the ocean waters of which the natural resources are under the exclusive management authority of the United States under the Magnuson Fishery Conservation and Management Act ... and (B) any other surface water, ground water, drinking water supply, land surface or subsurface strata, or *ambient air* within the United States or under the jurisdiction of the United States.

42 U.S.C.A. § 9601(8) (emphasis added).

First, SEPTA argues that the PCBs were released exclusively within a building. Case

law exists supporting the contention that the environment referred to by CERCLA includes the atmosphere external to a building, but not the air within a building. *See, e.g., 3550 Stevens Creek,* 915 F.2d at 1360.

However, given the testimony of its own expert, SEPTA cannot ask for summary judgment on this basis. There are three areas at issue—the viaduct, the shed, and the market. Dr. Louis Fournier, SEPTA's expert, concedes that the air above the viaduct, the air in the train shed, and the air in the market can be considered as ambient air. Fournier Deposition at 396–397. At the very least, the court must conclude that a genuine issue of material fact exists concerning this issue.

■ Even if the court found that no releases occurred, SEPTA cannot contend that there is no genuine issue of material fact concerning the existence of a threatened release into the environment.

SEPTA maintains that the contamination occurred only on the upper levels of the train shed and the interstitial space and that was no threatened release into the environment.

Reading presents evidence to the contrary. For instance, the PCBs had already migrated downward from the floor of the train shed, into the interstitial space, and even into portions of the ceiling of Reading Terminal market. Moscati Dep. at 104–107, Exhibit 117. There was fear that the PCBs would continue to migrate downward. Moscati Dep. at 31, Exh. 118. Moreover, there was the possibility that the 60,000 people a day in Reading Terminal market and the Convention Center construction workers could carry the contaminated material on their clothing. Decl. of Wunderle ¶¶ 3, 9, Exh. 106.

Under circumstances such as these, the court cannot conclude, as a matter of law, that there was no threatened release into the environment.[7] *See, Amland Properties*

---

7. SEPTA suggests that there must be a "causal link" between the costs of cleaning up and testing the inside of a building and any potential release outside the confines of the building. *See, Electric Power Bd. v. Westinghouse Electric Corp.* 716 F.Supp. 1069, 1080 (E.D.Tenn.1988). With-

out making any comment on the Tennessee court's conclusion, the court notes that on the facts of *Electric Power,* there was no threatened release into the environment. Rather, plaintiff was attempting to recover costs incurred in

*Corp. v. Aluminum Co. of America*, 711 F.Supp. 784, 793 (D.N.J.1989) (holding that where PCBs migrating through a concrete floor might eventually reach the ground there was threatened release and that under CERCLA there must only be a threatened release, not an actual or imminent release).

### IX. Consistent with the NCP

In order for a private party to recover any of its response costs under CERCLA, that party must prove that it incurred response costs "consistent with the national contingency plan." 42 U.S.C.A. § 9607(a)(4)(B); *Artesian Water Co. v. Government of New Castle County*, 659 F.Supp. 1269, 1278–79 (D.Del. 1987), *aff'd*, 851 F.2d 643 (3d Cir.1988); *Dedham Water Co. v. Cumberland Farms Diary, Inc.*, 889 F.2d 1146, 1150 (1st Cir.1989). SEPTA contends that Reading's cleanup was not consistent with the national contingency plan ("NCP") and that therefore the court must grant summary judgment in its favor. Because there are genuine issues of material fact concerning the consistency of Reading's cleanup with the NCP, the court cannot grant SEPTA summary judgment on the issue.

The NCP is a series of regulations promulgated by the EPA to establish "procedures, criteria and responsibilities" for response actions conducted both by the government and private parties. *Ambrogi v. Gould, Inc.*, 750 F.Supp. 1233, 1238 (M.D.Pa.1990). The NCP is designed "to assure that response actions are 'both cost-effective and environmentally sound.'" *Id.* (citation omitted).

■■■ Since CERCLA's passage in 1980, the EPA has issued three versions of the NCP—the 1982 NCP, the 1985 NCP, and the 1990 NCP. Courts evaluate response costs incurred against the NCP in force at the time that such costs were incurred. *NL Industries, Inc. v. Kaplan*, 792 F.2d 896, 898 (9th Cir.1986); *Pottstown Industrial Complex v. P.T.I. Services, Inc.*, 1992 WL 50084,

at *2 n. 4 1992 U.S. Dist. LEXIS 3256, at *7 n. 4 (E.D.Pa. March 10, 1992). The majority of Reading's cleanup transpired while the 1985 NCP was in force. By agreement of the parties, for the purposes of this motion, the court will evaluate all response costs against the 1985 NCP standards.[8]

In theory, determining whether response costs incurred by Reading can be classified as consistent with the 1985 NCP should be a relatively straightforward task. In practice, it is a whole "nother" story.

The 1985 NCP did not mention the standard of compliance necessary to be "consistent with the NCP." Prior to the promulgation of the 1990 NCP, the majority of courts interpreting the 1985 NCP required "strict compliance" with its provisions. *See, e.g., Amland Properties Corp. v. Aluminum Co. of America*, 711 F.Supp. 784, 796–97 (D.N.J.1989).

When the EPA promulgated the 1990 NCP, it expressly adopted a substantial compliance standard for response actions. The Code of Federal Regulations states:

> A private party response action will be considered 'consistent with the NCP' if the action, when evaluated as a whole, is in substantial compliance with the applicable requirements in paragraphs (c)(5) and (6) of this section, and results in a CERCLA-quality cleanup.

40 C.F.R. § 300.700(c)(3)(i) (1991). The EPA explained its decision in comments prefacing the adoption of the new regulation:

> EPA's decision to require only 'substantial' compliance with potentially applicable requirements is based, in large part, on the recognition that providing a list of rigid requirements might serve to defeat cost recovery for meritorious cleanup actions based on mere technical failure by the

cleaning and testing the inside of a building in connection with a past release into the air.

8. The vast majority of Reading's operations did in fact take place while the 1985 NCP was in force. However, the response costs incurred prior to February 18, 1986, are governed by the

1982 NCP and the response costs incurred after April 6, 1990, are governed by the 1990 NCP. Since both sides agree to apply the 1985 NCP to all the response costs, the court will also do so. SEPTA brief at 73–74, Reading brief at 174 n. 75.

private party that has taken the response action.

55 Fed.Reg. 8793 (1990).

In light of the above change made by the 1990 NCP, a number of courts have held that the substantial compliance standard simply clarifies the 1985 NCP and as a clarification applies to response costs incurred during the reign of the 1985 NCP. *See, Hatco Corp. v. W.R. Grace & Co.—Conn.*, 801 F.Supp. 1309, 1332–33 (D.N.J.1992); *Con–Tech Sales Defined Ben. Trust v. Cockerham*, 1991 WL 209791, at \*6, (E.D.Pa. October 8, 1991).

In the introduction to the 1990 NCP, the EPA stated that:

[t]oday's revisions to the NCP are intended to implement regulatory changes necessitated by SARA, **as well as to clarify existing NCP language** and to reorganize the NCP to coincide more accurately with the sequence of response actions.

55 Fed.Reg. 8666 (March 8, 1990) (emphasis added). Generally, courts must defer to an agency's interpretation of its own regulations. *Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965). Unless an agency's interpretation of its own regulations is "plainly erroneous or inconsistent with the regulation[s]," that interpretation has "controlling weight." *Id.* at 16–17, 85 S.Ct. at 801, quoting *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 413–14, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 (1945).

The court agrees with the logical conclusion that "to the extent that the subsequent regulations **clarify** the prior regulations as to private party obligations, such regulations will govern." *Versatile Metals, Inc. v. Union Corp*, 693 F.Supp. 1563, 1575 (E.D.Pa.1988). Furthermore, the court agrees with Judge Van Antwerpen's conclusion that:

the substantial compliance standard is meant to clarify the meaning of 'consistent with the NCP,' not to add a new provision. The 'strict compliance' standard advocated by defendants is a creation of the courts, not the EPA, and the agency has simply announced its disagreement with the courts' interpretation of section 107 of CERCLA and of the 1985 NCP.

*Con–Tech Sales Defined Ben. Trust v. Cockerham*, 1991 WL 209791, at \*6 (E.D.Pa. October 8, 1991).

■ The next question is how Reading's response costs should be classified. Under CERCLA, response costs can be characterized as either removal or remedial. Under the NCP, different regulations apply to the two actions. The requirements for proving that a remedial action is consistent with the NCP are more stringent than those for a removal action.

■ Under the 1985 NCP, a response action considered a removal is consistent with the NCP if "the person taking the response action" acts in circumstances warranting removal and implements removal consistent with § 300.65. 40 C.F.R. § 300.-71(a)(2)(i) (1985). On the other hand, the requirements for a remedial action are much more detailed. *See*, 40 C.F.R. § 300.-71(a)(2)(ii) (1985).

At the time of the 1985 NCP, CERCLA defined remove or removal as follows:

the cleanup or removal of released hazardous substances from the environment, such actions as may be necessary [sic] taken in the event of the threat of release of hazardous substances into the environment, such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances, the disposal of removed material, or the taking of such other actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances, the disposal of removed material, or the taking of such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare or to the environment, which may otherwise result from a release or threat of release. The term includes, in addition, without being limited to, security fencing or other measures to limit access, provision of alternative water supplies, temporary evacuation and housing of threatened individuals not otherwise provided for, action taken under section. . . .

42 U.S.C.A. § 9601(23).

On the other hand, CERCLA also defined the term remedy or remedial action. The statute explained:

'remedy' or 'remedial action' means those actions consistent with permanent remedy taken instead of or in addition to removal actions in the event of a release or threatened release of a hazardous substance into the environment, to prevent or minimize the release of hazardous substances so that they do not migrate to cause substantial danger to present or future public health or welfare or the environment. The term includes, but is not limited to, such actions at the location of the release as storage, confinement, perimeter protection using dikes, trenches, or ditches, clay cover, neutralization, cleanup of released hazardous substances or contaminated materials, recycling or reuse, diversion, destruction, segregation or reactive wastes, dredging or excavations, repair or replacement of leaking containers, collection of leachate and runoff, onsite treatment or incineration, provision of alternative.... **The term does not include offsite transport of hazardous substances, or the storage, treatment, destruction, or secure disposition offsite of such hazardous substances or contaminated materials unless the President determines that such actions (A) are more cost-effective than other remedial actions, (B) will create new capacity to manage, in compliance with subtitle C of the Solid Waste Disposal Act, hazardous substances in addition to those located at the affected facility, or (C) are necessary to protect public health or welfare or the environment from a present or potential risk which may be created by further exposure to the continued presence of such substances or materials ...**

42 U.S.C.A. § 9601(24) (emphasis added).

As one can easily imagine given the definitions above, courts have had some difficulty distinguishing removals from remediations. In fact, many courts have remarked upon the overlap between the definitions of the two terms. *See, e.g., Tri–County Business Campus Joint Venture v. Clow Corporation,* 792 F.Supp. 984 at 991–92 (E.D.Pa.1992).

As far as the court can determine, the majority of Reading's responses costs arose from removing PCB contaminated materials

from the terminal and disposing them in an offsite landfill. From a look at the statutory definitions alone, it appears that Reading's response action may well be characterized as a removal action, particularly since offsite transport is explicitly excluded from the definition of remedial action, except in specified circumstances. Neither party discusses whether any of the specified circumstances when offsite transport can be considered remedial apply in this case and whether the exceptions are even applicable in a private party action.

SEPTA contends that the bulk of Reading's response actions cannot properly be characterized as removal. It maintains that a removal must be an immediate response to an emergency situation. It points out that although some initial clean-up activity was conducted by Reading in 1985 and 1986, no cleanup occurred between February 1986 and February in 1989. The bulk of the cleanup was conducted between February 1989 and February 1991. To that end, SEPTA maintains that no immediate response was made and that therefore no urgent circumstances existed.

Although some courts have focused solely on the immediacy of response, this court finds that the better approach is to consider the totality of the circumstances. As Chief Judge Cahn explained:

The general teaching is that removal actions are primarily those intended for short-term clean-up arrangements and interim responses while remedial actions effect long-term or permanent remedies. (citations omitted) The mere fact, however, that what would otherwise be a removal action effects a permanent remedy does not convert that action into a remedial action. The EPA has clearly contemplated that a removal action might effect a permanent remedy. (citation omitted)....

Cost and duration of a response action is relevant to determining whether that action is a removal or a remedial action. Most important, perhaps, is the nature of the action actually taken.

The prototypical remedial action involves the onsite structural confinement of hazardous waste. Although the term "reme-

dial action" may, under certain circumstances, include offsite transport and storage, off-site actions are more easily characterized as removal actions. In addition, it cannot be ignored that the word 'removal' is descriptive as well as denotative.

None of these tests taken alone, adequately characterize a response action a removal or remedial action. The better approach is to view the action taken by the plaintiffs in light of several factors: the cost, complexity, and duration of the clean-up; the immediacy of the release or threatened release and the nature of the action actually taken.

*BCW Associates, Ltd. v. Occidental Chemical Corp,* 1988 WL 102641, *18–19 (E.D.Pa. September 29, 1988).

SEPTA notes that the determination of whether a response action can be classified as removal or remedial action is a matter of law and states that the court should be prepared to make such a determination at this time. Although the ultimate determination of whether response actions were remedial or removal is a question of law, SEPTA cannot deny that consideration of the factors to be considered in making that determination requires a fact intensive analysis.

The immediacy of the release or threatened release is one of the factors to be considered in making that determination. Reading has presented evidence that creates a genuine issue of material fact on this issue. For instance, Reading presents evidence that its consultants considered PCB contamination to be a threat to public health and that the PCBs in fact presented an imminent threat. Moscati Dep. II at 197, Reading Exh. 118, Moscati Decl. ¶8, Reading Exh. 104.

Therefore, the court at this time cannot make a final determination concerning the status of Reading's response costs. This issue can be dealt with appropriately at trial.

However, even if Reading's response can be considered a removal, the actions taken must still be consistent with the NCP. In order to comply with the NCP, Reading must have "act[ed] in circumstances warranting removal and implement removal action con-

sistent with section 300.65." 40 C.F.R. § 300.71(a)(2)(i) (1986).

Pertinent portions of this regulation read as follows:

§ 300.65 Removals

(a)(1) In determining the appropriate extent of action to be taken at a given release, the lead agency shall first review the preliminary assessment and the current site conditions to determine if removal action is appropriate.

(2) Where the responsible parties are known, an effort initially shall be made, to the extent practicable considering the exigencies of the circumstances, to have them perform the necessary removal actions....

(b)(2) The following factors shall be considered in determining the appropriateness of a removal action pursuant to this subsection:

(i) Actual or potential exposure to hazardous substances or pollutants or contaminants by nearby populations, animals, or food chain;

(ii) Actual or potential contamination of drinking water supplies or sensitive ecosystems;

(iii) Hazardous substances or pollutants or contaminants in drums, barrels, tanks, or other bulk storage containers, that may pose a threat of release;

(iv) High levels of hazardous substances or pollutants or contaminants in soils largely at or near the surface, that may migrate;

(v) Weather conditions that may cause hazardous substances or pollutants or contaminants to migrate or be released;

(vi) Threat of fire or explosion;

(vii) The availability of other appropriate Federal or State response mechanisms to respond to the release;

(viii) Other situations or factors which may pose threats to public health or welfare or the environment.

40 C.F.R. § 300.65 (1986). There are genuine issues of material fact with regard to Reading's compliance with § 300.65.

■ Conrail argues that regardless of whether the action is characterized as a removal and regardless of whether the require-

ments of § 300.65 were met, Reading must have conducted a "CERCLA quality" cleanup in order to recover any of its response costs. EPA defines CERCLA quality cleanup as follows:

> In order to achieve a 'CERCLA-quality cleanup,' the action must satisfy the three basic remedy selection requirements of CERCLA section 121(b)(1)—i.e., the remedial action must be 'protective of human health and the environment,' utilize 'permanent solutions and alternative treatment technologies or resource recovery technologies to the maximum extent practicable,' and be 'cost-effective'—attain applicable and relevant and appropriate requirements (ARARs) (CERCLA section 121(d)(4),
>
> and provide for meaningful public participation.

55 Fed.Reg. 8793 (1990).

Specifically, Conrail contends that Reading did not provide for meaningful public participation or follow CERCLA's remedy selection requirements. As the language above makes clear, the three basic remedy selection requirements only apply to remedial actions. Moreover, Reading has certainly raised a genuine issue of material fact regarding meaningful public participation. *See,* Tr. of City Council meeting, Reading Exh. 66, OHCS Report, Reading Exh. 33.

Because there are genuine issues of material fact concerning the possible removal action, the court need not consider whether Reading's cleanup, if a remedial action, substantially complied with NCP requirements.

## X. HSCA Claims

SEPTA advances a number of arguments in support of its motion for summary judgment on Reading's HSCA claims. Each argument will be discussed in turn.

### Private right of action

■ SEPTA submits that no private right of action exists under HSCA. The court rejected this argument in its March 3, 1992 order and has been presented with no reason to change its ruling. *See, Toole v. Gould, Inc.,* 764 F.Supp. 985 (M.D.Pa.1991); *General Electric Environmental Services, Inc. v. Envirotech Corporation,* 763 F.Supp.

113 (M.D.Pa.1991); *Lutz v. Chromatex, Inc.,* 725 F.Supp. 258 (M.D.Pa.1989).

### Consumer product exception

■ According to SEPTA, HSCA's consumer products exception should be interpreted identically to that same provision in CERCLA. Therefore, the court's decision that CERCLA's consumer products exception does not cover the railcars also applies here. Thus, SEPTA's summary judgment motion on this ground is denied.

### Exhaust emission

■ SEPTA states that HSCA's exhaust emission provision should be interpreted in the same fashion as CERCLA's exhaust emission provision. For that reason, the court's analysis of CERCLA's exhaust emission provision also applies here. Accordingly, the court denies SEPTA's motion for summary judgment on this issue.

### Consistent with the NCP

■ SEPTA argues that Reading may not recover under HSCA because its cleanup was not consistent with the NCP. Although the issue need not be decided at this juncture because the court cannot say, as a matter of law, that Reading failed to perform a cleanup consistent with the NCP, the court will address the issue now.

CERCLA expressly provides that "a covered person" shall be liable for "any other necessary costs of response incurred by any other person *consistent with the national contingency plan.*" 42 U.S.C.A. § 9607(a)(4)(B) (emphasis added). In contrast, HSCA makes no reference to the NCP in its comparable provision. Rather, HSCA imposes liability for "[o]ther reasonable and necessary or appropriate costs of response incurred by any other person." 35 Pa.Stat. Ann. § 6020.702(a)(3) (1993).

HSCA's wording is clearly more liberal than CERCLA's. Two courts deciding this issue previously have concluded that HSCA does not require compliance with NCP. *See, Tri–County Business v. Clow Corporation,* No. 90–5845, transcript at 15 (E.D.Pa. October 8, 1992) (Judge Bartle stated that "[u]n-

der HSCA, Tri–County was not required to demonstrate substantial compliance or consistency with any National Contingency Plan."); *Fry v. Leech Tool and Die Works, Inc.,* No. A.D. 1990–403 at 13–14 (rejecting argument that "plaintiffs' response cost must be incurred in accordance with the regulations espoused under the NCP").

SEPTA contends that section 504 of HSCA mandates compliance with the NCP. That portion of the statute states:

> (b) **Interim cleanup standards**—until final cleanup standards have been promulgated, state cleanup standards shall be those cleanup standards applicable under section 121 of the Federal Superfund Act.

Pa.Stat.Ann. § 6020.504(b).

Pennsylvania has yet to promulgate cleanup standards. Therefore, the court must examine section 121 of CERCLA in order to evaluate SEPTA's argument. Section 121 is a lengthy section addressing CERCLA cleanup standards. The section discusses remedy selection and the degree of cleanup necessary at a facility. Although section 121 does mention the NCP once[9], it does not identify the NCP as a clean-up standard. In fact, Dr. Fournier, SEPTA's own expert witness, concedes that the NCP is not a clean-up standard. Fournier Deposition at 112–13, Reading Exh. 111. Furthermore, if the Pennsylvania legislature wanted to reference the NCP in its definition of clean-up standards, it could have done so far more directly by mentioning CERCLA § 105 which defines the NCP and what it should contain.

For the reasons delineated above, the court denies SEPTA's motion for summary judgment on this issue.

*Consistency with the statutory requirements of HSCA*

SEPTA then argues that Reading's actions were not consistent with the statutory requirements of HSCA. Specifically, it argues that Reading should have complied with sections 505 and 506 of HSCA. Section 506 requires the development of an adminis-

trative record. 35 Pa.Stat.Ann. § 6020.506. Specifically, it requires the issuance of notice meeting specific requirements, a public comment period, a public hearing, a statement of the basis and purpose of the decision, and a docket listing. Section 505 requires that the selection of the remedial response be based upon the administrative record. 35 Pa.Stat. Ann. § 6020.505.

In reply, Reading posits that the terms of these two sections were plainly meant only to apply to Pennsylvania's Department of Environmental Resources ("DER") and not to private party cost recovery actions. No court has ruled on this issue.

The court denies SEPTA's motion for summary judgment on this issue. Sections 505 and 506 are clearly designed to apply to the DER and are based on administrative law principles. To compel private parties to comply with detailed requirements obviously designed for an administrative agency seems patently absurd. For instance, section 506(f) requires "the department [DER]" to "maintain a docket listing of all the items which form the administrative record" and to "notify a person submitting a comment that it has been entered on the docket." 35 Pa.Stat. Ann. § 6020.506(f). There is no reason to force private parties to follow this directive.

At the same time, the court recognizes that the reasons for some of the procedures that DER is required to follow are equally applicable in the private party context. For example, the notions of fairness and due process inherent in the notice provision requiring DER to notify responsible persons of a response action would have equal force in a private action. That is to say that the idea that notice should be given in a private party action is appropriate, even if the detailed requirements imposed on DER are inappropriate.

Fortunately, such concerns can be raised in a *private action without recourse to the administrative provisions of sections 505 and 506.* A private party may only recover "other reasonable and necessary or appropriate

---

**9.** Section 121 of CERCLA mentions the NCP only in its general statement concerning selection of remedial action. Section 121(a) states that "[t]he President shall select appropriate re- medial actions determined to be necessary … in accordance with this section and, to the extent practicable, the national contingency plan…." 42 U.S.C.A. § 9621(a).

costs of response." 35 Pa.Stat.Ann. § 6020.-702(a)(3). Thus, such concerns would necessarily be addressed in a determination of whether response costs were reasonable and necessary or appropriate.

### IX. Conclusion

For the reasons set forth above, defendants' motion for summary judgment is denied.