ANALYTICAL MEASUREMENTS, INC.; (a NJ corporation held in trust by Ella May Paully and Theresa Scarinzi), and Ella May Paully (individually), Plaintiffs,

v.

The KEUFFEL & ESSER COMPANY; and The Azon Corporation, Defendants.

Civ. No. 89–2512.

United States District Court, D. New Jersey.

Oct. 28, 1993.

George J. Grochala, Morristown, NJ, for plaintiffs.

John H. Klock, Maria T. Nersesian, Crummy, Del Deo, Dolan, Griffinger & Vecchione, Newark, NJ, for defendants Azon Corp. and Keuffel & Esser Co.

## OPINION

DEBEVOISE, District Judge.

Defendants, Azon Corporation ("Azon") and Keuffel & Esser Company ("K & E"), move for summary judgment pursuant to Fed.R.Civ.P. 56 on Counts One through Six in plaintiffs Analytical Measurements, Inc.'s and the Estate of Ella May Paully's Second Amended Complaint. Plaintiffs cross-move for partial summary judgment.

Because plaintiffs are no longer proceeding against defendants regarding their statutory claims under the Environmental Cleanup Responsibility Act ("ECRA"), N.J.Stat.Ann. § 13:1K–6 et seq., the Resource Conservation and Recovery Act ("RECRA"), 42 U.S.C. § 6901 et seq., the Toxic Substances Control Act ("TSCA"), 15 U.S.C. § 2601 et seq., The Clean Water Act, 33 U.S.C. § 1251 et seq., and the Water Pollution Control Act, N.J.Stat.Ann. § 58:10A–1 et seq.; defendants' motion regarding these claims is granted and they are dismissed.

For the following reasons, defendants' motion is granted on the breach of covenant against encumbrances claim and plaintiffs' motion is granted as to liability on the Spill Act claim, subject to a determination whether Azon is liable by virtue of its purchase of K & E. The remaining claims contain factu-

al issues which preclude their being decided on this motion.

## SUMMARY OF FACTS AND PROCEDURAL HISTORY

### A. Background

Plaintiff the Estate of Ella May Paully[1] is the owner of property located at 31 Willow Street in Chatham, New Jersey (the "Property"). Since 1967, plaintiff Analytical Measurements, Inc. ("Analytical") has rented the Property. Analytical is a New Jersey corporation with its principal place of business in New Jersey. Analytical is owned and operated by a trust with the Estate of Ella May Paully and Theresa Scarinzi serving as trustees.

Ella May Paully's husband, Frank Paully,[2] purchased the Property from K & E in 1967. K & E is a California corporation with its principal place of business in New Jersey. Between approximately 1947 and 1967, K & E owned the Property and operated a photosensitive paper coating factory which was commonly known as the "Redon" plant (hereinafter referred to as "Redon Plant" or "Chatham Facility"). Among other things, diazo dye was used by K & E to coat rolls of paper at the Property during this period. Such coated paper was commonly used as blueprint paper by architects, engineers and other draftsmen.

K & E used many different formulations of diazo dye over the years. Various chemicals, including zinc and zinc chloride were constituents of some of those formulas. Prior to 1951, the liquid chemical wastes from the factory flowed from the floor drains, through underground pipes, to a ditch located off site on adjacent property owned by a railroad. In approximately 1951, some of the chemical waste reached the Passaic River and complaints were registered by the Passaic County Water Commission. As a result, K & E revised its system of chemical waste disposal whereby the floor drains emptied, through underground piping, into a "lagoon" at the rear of the property. The lagoon was con-

structed with a bulldozer in approximately 1952. Sometime within the next few years, the first lagoon became clogged due to precipitate from the waste and a second lagoon was constructed. From that time until the Redon Facility moved to Rockaway, New Jersey in approximately 1966, both lagoons were used alternately for the disposal of chemical waste. The extent of Frank Paully's knowledge concerning the lagoons is disputed.

In 1982, K & E was taken over in a tender offer transaction by a company known as Kratos Corporation which eventually went into bankruptcy. In 1986, Azon purchased the former K & E.

This suit arose from Ella Paully's thwarted attempt to sell the Property which Analytical now leases. On March 24, 1988 Paully entered into a contract to sell the Property to the G.J.L. Corporation ("G.J.L.") for between $2,100,000 and $3,400,000. Under a New Jersey State law enacted in 1983, before selling an industrial site, certification that the land is not contaminated must be obtained from the State. See Environmental Cleanup Responsibility Act ("ECRA") N.J.STAT.ANN. § 13:1K–6 et seq. The State found that the Property and adjoining property were contaminated by hazardous substances and wastes such as asbestos, petroleum hydrocarbons and diazo dye waste, the chemical used by K & E for coating its paper products. The State held both Paully and Analytical jointly and severally strictly liable for the cost of cleaning the Property. Analytical was subject to ECRA by reason of its manufacture of ph meters on the property. Because of the contamination G.J.L. filed a lawsuit in 1990 to rescind the contract. The contract subsequently expired automatically in November 1992, after neither party could perform on the last date set for closing.

### B. Cleanup

Pursuant to directives from The New Jersey Department of Environmental Protection and Energy ["NJDEPE"], plaintiffs excavat-

---

1. Ella May Paully died in 1992, while this suit was pending.

2. Frank Paully died in 1986.

ed 8,400 tons of soil contained in the lagoon and floor drain A. The first 600 tons of zinc and petroleum hydrocarbon contaminated soil were disposed of at an approved landfill in Ohio, at plaintiffs' expense. However, based upon a change in New Jersey's waste flow policy, an additional 7,800 tons of similarly contaminated soil were disposed of at the Hackensack Meadowlands landfill for use as recyclable daycover. Plaintiffs claim that this excavation and relocation took years to complete because plaintiffs exhausted their funds in 1989 and K & E refused to provide any assistance until after May 1990 and again in May 1991. In May of 1990, K & E provided $190,000 in initial funding under an Interim Cost Sharing Agreement ("Agreement"). The Agreement was designed to allow K & E to fund a portion of the ongoing cleanup in order to mitigate the potential damages against it in this case. These moneys funded portions of continuing work, such as the disposal of the remaining excavated lagoon soil at the Hackensack Meadowlands Landfill and the implementation of the groundwater investigation plan. In 1991, K & E agreed to pay an additional $183,000 under the Agreement. As a result, to date K & E has paid a total of $373,000 toward the cleanup.

Prior to K & E providing initial funding and assistance in May of 1990, plaintiffs spent $264,324.76 to begin the initial soil and groundwater investigation, analyze the problems and alternatives, excavate the soil, and remove the first 600 tons of soil to Ohio. They subsequently spent $22,397.25 for the design of a groundwater investigation plan. It is these $286,722.01 in past expenses that plaintiffs still seek from K & E.[3] Thereafter, plaintiff expended another $2,967.47 for groundwater well sealing and closure. Plaintiffs total unreimbursed expenses for investigation, analysis and cleanup total $289,689.48.

In 1991, NJDEPE approved the cleanup and issued ECRA clearance for the property.

## C. *Procedural History*

Plaintiffs instituted this action to obtain contribution from defendants for clean-up of the site. Plaintiffs filed the original Complaint on or about May 16, 1989 in the Superior Court of New Jersey, Law Division, Morris County. Defendants filed a Notice of Removal to this Court on or about June 5, 1989. After a Consent Order Extending Time to Answer was filed, K & E and Azon answered the Complaint on or about August 4, 1989. A motion to remand the case to Superior Court was denied by Order entered on or about January 9, 1990.

Plaintiffs filed a First Amended Complaint on or about February 27, 1990. Defendants answered the First Amended Complaint on or about April 26, 1990. Two substantive motions have previously been decided in this case. First, on August 24, 1992 I denied K & E's motion to enforce a settlement agreement. Second, on February 9, 1993, I granted in part and denied in party Alfred Busch's motion for summary judgment. 816 F.Supp. 291. Thereafter, the individual defendants (William Keller, Robert Keller and Alfred Busch) settled with plaintiffs. The only remaining defendants in this case are K & E and Azon.

Subsequently, plaintiffs filed a Second Amended Complaint against K & E and Azon on or about February 1, 1993, which defendants answered on or about March 16, 1993. The present motions concern the Second Amended Complaint which contains the following claims: (Count I) Nuisance; (Count II) Breach of Covenants and Deeds; (Count III) Strict Liability; (Count IV) Statutory Violations under state and federal law; (Count V) Indemnification; and (Count VI) Contribution.

There has been full discovery in this case. Numerous depositions have been taken, and interrogatories and documents have been exchanged.

### *STANDARD OF REVIEW*

■ Summary judgment is appropriate where the moving party establishes that "there is no genuine issue of material fact and that [it] is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c) The

---

**3.** These expenses do not include those incurred for removal of asbestos form the building or the underground fuel storage tanks. Plaintiffs do not seek those costs from K & E.

moving party must show that if the evidentiary material of record were reduced to admissible evidence in court, it would be insufficient to permit the non-moving party to carry its burden of proof. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

■ Once the moving party has carried its burden under Rule 56, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts in question." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), *rev'g,* 723 F.2d 238 (3d Cir.1983). The opposing party must set forth specific facts showing a genuine issue for trial and may not rest upon the mere allegations or denials of its pleadings. *Sound Ship Building Corp. v. Bethlehem Steel Co.,* 533 F.2d 96, 99 (3d Cir.1976), *cert. denied,* 429 U.S. 860, 97 S.Ct. 161, 50 L.Ed.2d 137 (1976).

■ The Supreme Court has explained that in evaluating the evidence presented, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Wahl v. Rexnord,* 624 F.2d 1169, 1181 (3d Cir.1980). When ruling on a motion for summary judgment the court must also consider the relevant burdens of proof at trial. *Celotex Corp. Catrett,* 477 U.S. 317, 322–24, 106 S.Ct. 2548, 2552–53. *See also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

### DISCUSSION

I. *Azon's Liability*

Plaintiff argues that Azon is liable under the Spill Compensation and Control Act, N.J.STAT.ANN. § 58:10–23.11 *et seq.,* as a parent and successor corporation.

■ The New Jersey Supreme Court has recognized two ways that a parent corporation can be held liable for actions of its subsidiary under the Spill Act. The first is if a court finds that the corporate veil can be pierced because the subsidiary is "'a mere instrumentality of the parent corporation.'" *State Department of Environ. Protection v.*

*Ventron Corp.,* 94 N.J. 473, 500–01, 468 A.2d 150 (1983) (*quoting Mueller v. Seaboard Commercial Corp.,* 5 N.J. 28, 34–35, 73 A.2d 905 (1950)). The plaintiff must prove that the parent so dominated the subsidiary that it had no separate existence but was merely a conduit for the parent. *Ventron,* 94 N.J. at 501, 468 A.2d 150. "Even in the presence of corporate dominance, liability generally is imposed only when the parent has abused the privilege of incorporation by using the subsidiary to perpetrate a fraud or injustice, or otherwise to circumvent the law." *Id.* There is no competent evidence being asserted to show that Azon purchased the assets of the former K & E to perpetrate a fraud or injustice such that piercing the corporate veil would be proper on that ground.

· The second method, as noted by the *Ventron* court, to hold a parent corporation liable under the Spill Act is to find that it was "in any way responsible for the discharge." *Id.* at 502, 468 A.2d 150. (quoting N.J.STAT.ANN. § 58:10–23.11g(c)). According to the *Ventron* court, if it can be shown that the parent corporation had ownership or control over the property at the time of the discharge, the parent corporation may be held liable. *Ventron,* 94 N.J. at 502, 468 A.2d 150. In *Ventron,* the court held the parent corporation liable because the court found that the parent permitted the subsidiary to use the property as a mercury dump, that the parent corporation was the sole shareholder and that all the members on the subsidiary's board were employees of the parent corporation. *Id.* at 502, 468 A.2d 150. Viewing these facts together, the court concluded that the parent corporation was "responsible" within the meaning of the Spill Act. *Id.* Azon cannot be held liable under the Spill Act under the "in any way responsible" standard discussed in *Ventron* because Azon did not own K & E until approximately 20 years after the discharging had ceased.

■ Lastly, plaintiffs assert that Azon should be held liable as a successor corporation. In New Jersey, the traditional corporate law rules provide that where one company sells or otherwise transfers all of its assets to another company the latter is not liable for the liabilities of the transferor,

including those arising out of the latter's tortious conduct. *Ramirez v. Amsted Indus., Inc.,* 86 N.J. 332, 431 A.2d 811 (1981). However, there are five recognized exceptions to this general rule where the purchasing corporation will be held responsible: (1) the purchaser expressly or impliedly agrees to assume such debts and liabilities; (2) the transaction amounts to a consolidation or merger of the seller and purchaser, (3) the purchasing corporation is merely a continuation of the selling corporation; (4) the transaction is entered into fraudulently in order to escape responsibility for such liabilities and (5) there was an absence of considerations for the sale or transfer. *Id.* at 340–341, 431 A.2d 811. Plaintiff asserts that the third exception is applicable here.

In *Ramirez,* the New Jersey Supreme Court broadened the law holding a purchaser liable after it has purchased all the manufacturing assets of another corporation and the successor corporation continues essentially the same manufacturing operation as the predecessor corporation. The *Ramirez* court held that "where one corporation acquires all or substantially all the manufacturing assets of another corporation ... the purchasing corporation is 'strictly liable for injuries caused by defects in units of the same product line,' even if previously manufactured and distributed by the selling corporation or its predecessor." *Id.* at 358, 431 A.2d 811. The court relied on the tripartite policy analysis of *Ray v. Alad Corp.,* 19 Cal.3d 22, 560 P.2d 3, 136 Cal.Rptr. 574 (1977), which considers,

(1) The virtual destruction of the plaintiff's remedies against the original manufacturer caused by the successor's acquisition of the business,

(2) The successor's ability to assume the original manufacturer's risk spreading role, and

(3) The fairness of requiring the successor to assume a responsibility for defective products that was a burden necessarily attached to the original manufacturer's

goodwill being enjoyed by the successor in the continued operation of the business. *Id.* 86 N.J. at 349, 431 A.2d 811.

In the instant case, in 1982, K & E was taken over in a tender offer transaction by a company known as Kratos Corporation which eventually went into bankruptcy. In 1986, Azon purchased the assets of the former K & E such that the former K & E is a wholly owned subsidiary of Azon. K & E discharged the waste complained of in this action between 1947 and 1966.

In their Joint Answer to the original Complaint, defendants stated that Azon is the parent and successor to K & E. (Answer at ¶ 3.) In addition, in the May 1992 Pre–Trial Order defendants stated that "In 1985, the Azon Corporation ... purchased all of K & E's assets and liabilities...." (May 1992 Pre–Trial Order at p. 5 ¶ 18.) Thereafter, in June of 1992, plaintiffs' counsel wrote a letter to defendants' counsel confirming that they were not asserting that defense and that no discovery was needed on that issue. One year later in the July 1993 Pre-trial Order defendants denied that Azon was a successor, claiming instead that Azon and K & E are separate corporations. (July 1, 1993 Pre–Trial Order at p. 15 ¶ 17.) Nonetheless Azon admits in both Final Pretrial Orders that it is the present owner of all of K & E's assets and liabilities. (May 1992 Pre–Trial Order ¶¶ 17–18, July 1993 Pre–Trial Order ¶¶ 5–6.) Additionally, Messrs. Manko, Lubar and Shanley have testified that Azon manufactures the same products K & E formerly produced.

Summary judgment cannot be granted with respect to whether Azon is liable as a successor corporation because there are issues of fact regarding whether Azon continued the operations of K & E. Plaintiffs and defendants dispute the weight the testimony of various present and former employees should be given. Since K & E has been inconsistent in asserting its successor liability defense, thereby inhibiting plaintiffs' discovery strategy, the Pre-trial Order is amended to include as a witness, David Stricland, esq., who was an attorney for K & E and Azon.[4]

4. Federal Rule of Civil Procedure 16(e) states that a final pretrial order "shall control the sub-

sequent course of the action unless modified by a subsequent order. The order following a final

Secondly, there is a question of fact regarding whether Azon's purchase of the former K & E's assets contributed to the destruction of K & E when Kratos, which owned K & E before Azon, went bankrupt while owning K & E. In addition, the parties should address the successor liability issue in their trial brief in light of the fact that lower New Jersey state courts differ as to the importance and the implication of this factor in the *Ramirez* decision. *Compare Holloway v. State*, 237 N.J.Super. 71, 75, 566 A.2d 1177 (Law Div.1989) ("The most important policy consideration adopted from *Ray* by the Court in *Ramirez* is the two prong test of whether 1). the plaintiff's remedies against the predecessor corporation have been destroyed and 2). the successor corporation caused the destruction by its acquisition of the predecessor corporation." *with Pacius v. Thermtroll Corp.*, 259 N.J.Super. 51, 56, 611 A.2d 153 (Law Div.1992) ("Although both [the *Ramirez* and *Nieves v. Bruno Sherman Corp.*, 86 N.J. 361, 431 A.2d 826 (1981)] cases considered the *Ray* factors as a basis for the imposition of liability, the Supreme Court did not incorporate them in its holding, nor indicate that they were necessary elements for the imposition of liability."); *see also Goncalves v. Wire Technology & Machinery Co.*, 253 N.J.Super. 327, 331–32, 601 A.2d 780 (Law Div.1991) (application of the rule when selling corporation is bankrupt).

## II. *Strict Liability and Nuisance Claims*

### A. *Statute of Limitations*

 The limitation periods applicable to plaintiffs' strict liability and nuisance claims are governed by N.J.Stat.Ann. § 2A:14–1, which requires that such actions be brought within six years of when the cause of action accrued. However, New Jersey courts recognize the "discovery rule," an equitable principle which delays the accrual of a cause of action "until the injured party discovers, or by an exercise of reasonable

diligence and intelligence should have discovered[,] that he may have a basis of an actionable claim." *Viviano v. CBS, Inc.*, 101 N.J. 538, 546, 503 A.2d 296 (1986) (quoting *Lopez v. Swyer*, 62 N.J. 267, 272, 300 A.2d 563 (1973)). Under the discovery rule, a cause of action ordinarily accrues when a plaintiff knows of his injuries and has sufficient facts to attribute those injuries to the fault of another. *Viviano*, 101 N.J. at 546, 503 A.2d 296; *Lynch v. Rubacky*, 85 N.J. 65, 73–75, 424 A.2d 1169 (1981). Thus, the critical question under the discovery rule is whether plaintiffs knew, or by an exercise of reasonable diligence should have discovered, that they had a basis for a claim more than six years prior to the date they filed their Complaint in this action, *i.e.*, within 6 years of May 16, 1989.

Each party is convinced that summary judgment should be granted in its favor; however, it is clear to me that a question of fact is presented. Defendants rely on the transcript of a January 25, 1967 hearing before the Chatham Zoning Board of Adjustment where residents expressed concern that the lagoons contained "unpleasant looking liquid floating in them." Moreover the lagoons were referred to as "Acid pits" on at least three occasions during the Chatham Board Proceeding. Frank Paully denied seeing an accumulation in the lagoons and stated that they always appeared to be dry to him. Plaintiffs note that the lagoons were not in use in 1967 when the Board of Adjustment hearing took place. Mere knowledge of the existence of the lagoons would not be enough to constitute discovery. Paully must have had some information putting him on notice of the kind of risks he confronted. Whether the Paullys knew or should have known of such risks is a question of fact. That Mrs. Paully was a housewife at certain relevant times is a fact to be weighed by the jury.

### B. *Strict Liability for Conducting Abnormally Dangerous Activity*

 A landowner which conducts an abnormally dangerous activity on its proper-

---

pretrial conference shall be modified only to prevent manifest injustice."

Whether to permit the amendment of a final pretrial order is entirely within the discretionary power of the trial court. *Joy Mfg. Co. v. Sola*

*Basic Indus., Inc.*, 697 F.2d 104, 109 (3d Cir. 1982). Under the circumstances, I believe the only way to avoid manifest injustice to plaintiffs is to include Mr. Stricland as a witness.

ty is strictly liable to subsequent owners of the property for any harm caused by that activity. *T & E Indus., Inc. v. Safety Light Corp.*, 123 N.J. 371, 587 A.2d 1249 (1991).

The six factors articulated in § 520 of the *Restatement (Second) of Torts* should be considered in determining whether an activity is "abnormally dangerous":

> (a) the existence of high degree of risk of some harm to the person, land or chattel of others;
>
> (b) the likelihood that the harm that results from it will be great;
>
> (c) the inability to eliminate the risk by the exercise of reasonable care;
>
> (d) the extent to which the activity is not a matter of common usage;
>
> (e) the inappropriateness of the activity to the place where it is carried on; and
>
> (f) the extent to which its value to the community is outweighed by its dangerous attributes.

*Id.* at 390, 587 A.2d 1249. Plaintiffs assert that since former employees of K & E have described chemicals used by K & E as "poisonous", "flammable" "explosive" and "highly acidic," the chemicals must have possessed a high degree of risk of great harm to plants, aquatic life, property, persons and chattel. Plaintiffs note that many of the compounds K & E used and discharged, *e.g.*, acetone, ethyl acetate, ethyl benzene, methyl isobutyl ketone, methanol, benzene, phenols, acids, thiourea, benezinmine isomers, naphthalene, resorcinol, etc., are listed as hazardous substances in N.J.Admin.Code titl. 7 § 26–8.15 to .16. However, it is clear from *T & E Indus.* and the *Restatement*, that a factual determination must be made regarding each of the factors in Section 520 of the *Restatement*. Indeed, the New Jersey Supreme Court made it clear in the *T & E Indus.* and *Ventron* cases that, "[u]nder *Restatement* analysis, whether an activity is abnormally dangerous is to be determined on a case-by-case basis, taking all relevant circumstances into consideration." *T & E Indus.*, 123 N.J. at 391, 587 A.2d 1249 (quoting *Ventron*, 94 N.J. at 491, 468 A.2d 150). Moreover, the Court criticized the Appellate Division for concluding that the processing of radium and disposal of its waste produce was an abnor-mally dangerous activity as a matter of law. *T & E Indus*, 123 N.J. at 391, 587 A.2d 1249. As a result, plaintiffs' motion for summary judgment on this claim is denied.

■ Defendants respond that they cannot be held strictly liable for abnormally dangerous activities because the soil was classified as non-hazardous by the NJDEPE. Defendants highlight the fact that the result of K & E's activity was, at most, zinc-contaminated soil, which defendants have already paid to remediate. Whether the soil is non-hazardous is a factual determination. The manner in which the NJDEPE classifies the soil may be a factor in that determination. It should be noted that classification of a substance as "hazardous" under one statute or regulation or rule of common law may not be determinative of its classification under another statute, regulation or rule of common law.

### III. *Spill Compensation and Control Act*

In 1976, New Jersey enacted the Spill Compensation and Control Act ("Spill Act" or the "Act"), N.J.Stat.Ann. § 58:10–23.11 *et seq.* One of the purposes of the Act is to assess liability for damages caused by the discharge of "hazardous substances", as defined by the Act. N.J.Stat.Ann. § 58:10–23.11a. N.J.Stat.Ann. § 58:10–11g(c)(1) imposes liability under the Spill Act as follows:

> Any person who has discharged a hazardous substance, or is in any way responsible for any hazardous substance, shall be strictly liable, jointly and severally, without regard to fault, for all cleanup and removal costs no matter by whom incurred. Such person shall be strictly liable, jointly and severally, without regard to fault, for all cleanup and removal costs incurred by the department or a local unit pursuant to subsection b. of section 7 of P.L.1976, c. 141 (C. 58:10–23.11f)

The Act is to be liberally construed. *Id.* at § 58:10–23.11x. A party even remotely responsible for causing contamination will be deemed a responsible party and held strictly liable, jointly and severally, for all cleanup and removal costs. *Matter of Kimber Petroleum Corp.*, 110 N.J. 69, 85, 539 A.2d 1181

(1988), *appeal dismissed,* 488 U.S. 935, 109 S.Ct. 358, 102 L.Ed.2d 349 (1988).

N.J.Stat.Ann. § 58:10–23.11f was recently amended to provide a private right of action for contribution and became effective on January 10, 1992. Subsection f(a)(2) now provides in pertinent part as follows:

> Whenever one or more dischargers or persons cleans up and removes a discharge of a hazardous substance, those dischargers and persons shall have a right of contribution against all other dischargers and persons in any way responsible for a discharged hazardous substance who are liable for the cost of the cleanup and removal of that discharge of a hazardous substance. In an action for contribution, the contribution plaintiffs need only prove that a discharge occurred for which the contribution defendant or defendants are liable pursuant to the provisions of subsection c. of section 8 of P.L.1976, c. 141 (C. 58:10–23.11g), and the contribution defendant shall have only the defenses to liability available to parties pursuant to subsection d. of section 8 of P.L.1976, c. 141 (C. 58:10–23.11g). In resolving contribution claims, a court may allocate the costs of clean up and removal among liable parties using such equitable factors as the court determines are appropriate. . . .

The State Legislature intended to clarify that private parties could obtain contribution under the Spill Act, the requisite standard of proof and the allowable defenses. The Legislature explained that the purpose of the amendment was to alleviate dischargers fears of entering into an agreement with the Department of Environmental Protection to cleanup a discharge and then being unable to recover some of their costs from other liable parties. *See Id.* at § 58:10–23.11f note (Sen. Environ. Quality Comm. Statement, Sen. No. 2657 and Assembly No. 3659—L.1991 ch. 372).

The amendment does not expressly provide whether the 1992 Spill Act amendment for the private right of contribution is to be retroactively applied. Although the New Jersey Supreme Court has not ruled on this issue, in *Bowen Engineering v. Estate of Reeve,* 799 F.Supp. 467, 479–80 (D.N.J.1992), Judge Thompson held that it does. Judge Thompson noted that as a general rule changes in statutory law in New Jersey are applied prospectively rather than retroactively. *Id.* at 479. Judge Thompson added, however, that under New Jersey law there are three recognized exceptions: " 'when the Legislature has expressed its intent, either explicitly or implicitly, that the statute should be so applied; when the statute is curative [or ameliorative]; or when the reasonable expectations of those affected by the statute warrant such application.' " *Id.* at 479–80 (quoting *Twiss v. New Jersey Dep't of the Treasury,* 124 N.J. 461, 467, 591 A.2d 913 (1991)). Judge Thompson then determined that legislative history clearly revealed that the amendments were intended to be curative. *Id.* at 480, 591 A.2d 913.[5]

I find that summary judgment on liability must be granted in favor of plaintiffs on the Spill Act claim. Azon's, liability, of course, depends upon a resolution of the factual issue discussed in Section I of this opinion.

Defendants contend that they have already paid approximately $373,000 for the cost of removing soil and for monitoring costs, and that plaintiffs agreed in the alleged agreement of May 24, 1990 to forego pursuing claims for other removal expenses in the amount of $264,324.76. However, the alleged agreement simply states that "if a settlement does not eventuate, the funds advanced will be removed from any damage claim." *See* Klock 2nd Certification Ex. 3. Plaintiffs seek to recover only those cleanup costs for which they have paid and not been reimbursed. According to plaintiffs, the $264,-324.76 figure represents the costs of the ini-

---

**5.** The court's assessment in *Bowen Engineering,* that there is no indication that the legislature intended the amendment to be applied retroactively might be questioned. The Senate Environmental Quality Committee Statement provides, Finally, wording changes intend to clarify that the committee substitute applies to any clean-

up or removal, *irrespective of the date of discharge.*
N.J.Stat.Ann. § 58:10–23.11f note (Sen. No. 2657 and Assembly No. 3659–L.1991, c. 372. (emphasis added)

tial soil and groundwater investigation, analysis of problems and alternatives, excavation of soil, and removal of the first 600 tons of soil to Ohio. *See* Grochala Certification Ex. 37. Additionally, plaintiffs subsequently spent 22,397.25 for the design of a groundwater investigation plan. These costs are clearly recoverable under the Spill Act since they are associated with the cleanup and removal of discharged hazardous substances. *See* N.J.STAT.ANN. § 58:10–23.11f(a)(2) (dischargers are "liable for the cost of the cleanup and removal of [ ] discharge of a hazardous substance."); § 58:10–23.11b(d) (cleanup and removal costs "means all costs associated with a discharge, . . . in the: (1) removal or attempted removal of hazardous substances . . . ."). Since there is no indication, nor have defendants alleged, that Analytical was in any way responsible for the contamination, defendants must reimburse plaintiffs for the costs of the entire cleanup. However, I will not award plaintiffs the moneys they seek until a more detailed listing of all costs associated with the cleanup are presented to the court, including those costs paid by defendants.

■ Although they did not specifically raise the defense under the Spill Act, defendants have argued in other sections of their brief that they cannot be liable for the cleanup because the soil was not "hazardous." The soil removed to Ohio contained, among other substances, petroleum hydrocarbon, zinc, silver and antimony. *See* Grochala Certification Ex. 41. The Spill Act lists "petroleum products" in its definition of "hazardous" substances. N.J.STAT.ANN. § 58:10–23.-11b(k). Additionally, the definition of hazardous substances includes those substances listed "on the environmental hazardous substance list adopted by the [New Jersey] [D]epartment [of Environmental Protection]." The Department's list of hazardous substances includes zinc (fume or dust), silver and antimony. *See* Grochala Letter to Court September 23, 1993 Ex. E.

The fact that the second batch of soil removed from the property to the Hackensack Meadowlands Landfill was classified as solid waste I.D. No. 27—defined as "non-hazardous" pursuant to the rules of the Division of Hazardous Waste Management—is not relevant to a determination of liability under the Act. Under the plain language of the Spill Act "[a]ny person who has discharged a hazardous substance" is liable for the cost of the cleanup and removal of that discharge. While the soil in its entirety may have been "non-hazardous" under specific rules within the NJDEPE, specific substances within it were hazardous as defined by the Act. If the New Jersey Legislature had intended to impose a threshold requirement on the definition of hazardous substances, it could have easily so indicated.[6]

The 1992 amendment to allow a private right to contribution is plain. "Any person who has discharged a hazardous substance . . . shall be strictly liable . . . for all cleanup and removal costs no matter by whom incurred." Here, hazardous substances as defined by the Act were put into the soil by defendants, and subsequently removed by plaintiffs. Allowing plaintiffs to recover the costs associated with that cleanup effectuates the objective of the amendment.

■ Plaintiffs seek a declaratory judgment requiring defendants to indemnify plaintiffs for any future soil and ground water contamination response costs that may be necessary. Whether declaratory relief should be granted in a particular case is committed to the sound discretion of the trial court. *Bituminous Coal Operator's Ass'n., Inc. v. International Union, United Mine Workers of America*, 585 F.2d 586, 595–96 (3d Cir.1978). In determining the appropriateness of declaratory relief, the court must consider whether it will resolve an uncertainty giving rise to a controversy, the convenience of the parties, the public interest and the availability of other remedies. *Id.* at 596–97. I believe that a declaratory judgment is appropriate in this case. It will resolve any uncertainties over who is responsible for future cleanups on the property and enable the parties to work effectively together to deal with future removal activities. Therefore, a judgment should be entered declaring defendants liable for all future

---

**6.** I also note that the soil removed to Ohio was never classified as solid waste I.D. No. 27.

costs associated with any cleanup, required by the NJDEPE, of substances that were dumped on the Property by K & E between 1951 and 1966. Again Azon's liability depends upon a resolution of the factual issue discussed in Section I of this opinion.

Plaintiffs also seek damages for the loss of a real estate contract, valued between $2,100,000 and $2,205,000; diminution in property value in the amount of $900,000; compensatory damages in the form of attorney's fees to defend the G.J.L. contract recision suit, undetermined fees regarding investigation and overseeing the cleanup, coordination with the NJDEPE, and defending the $325,000 penalty action by NJDEPE. The Spill Act only provides contribution for the recovery of "cleanup and removal" costs. There is no indication in the legislative history that the Legislature intended to expand the right of contribution under the Spill Act to include other expenses or damages. Moreover, it is well settled in New Jersey, that compensation for attorneys or otherwise, are not recoverable absent express authorization by statute, court rule or contract. *Ventron*, 94 N.J. at 504, 468 A.2d 150 (1983); *see also* N.J.Ct.R. 4:42–9.[7]

### IV. *CERCLA*

Plaintiff asserts a claim for contribution under CERCLA, 42 U.S.C. § 9613(f)(1)[8] and, in the alternative, a direct private cause of action under § 9607 of CERCLA. To state a claim under 42 U.S.C. § 9607(a), a plaintiff must allege that (1) the waste dis-

posal site is a "facility" within the meaning of 42 U.S.C. § 9601(9); (2) a "release" or "threatened release" of any "hazardous substance" from the facility has occurred, *id.* § 9607(a)(4); (3) such "release" or "threatened release" has caused plaintiff to incur response costs that are "consistent with the national contingency plan," *id.* §§ 9607(a)(4) & (a)(4)(B); and (4) defendant falls within one of the four classes of persons subject to CERCLA's liability provisions, 42 U.S.C. § 9607(a)(1)–(4). *Ascon Properties, Inc. v. Mobil Oil Co.*, 866 F.2d 1149, 1152–53 (9th Cir.1989); *New York v. Shore Realty Corp.*, 759 F.2d 1032, 1043 (2d Cir.1985).

Defendants contend that plaintiff may not succeed on a claim under CERCLA because (1) the soil removed from the site was nonhazardous waste; and (2) plaintiffs have not shown that the cleanup of the site was consistent with the National Contingency Plan ("NCP").

Defendants first argument is not persuasive. Like the New Jersey Spill Act, CERCLA does not set minimum requirements for the amount of hazardous substances which must be dumped in order to trigger liability under the Act. *See U.S. v. Alcan Aluminum Corp.*, 964 F.2d 252 (3d Cir.1992) (Environmental Protection Agency's statement that it did not find waste to be "hazardous" under the Resource Conservation and Recovery Act (RCRA) did not alter court's finding that waste was hazardous under CERCLA since "RCRA's goals differ from CERCLA's").

---

7. Plaintiffs' claim that they are entitled to indirect damages as well as cleanup and removal costs based on N.J.Stat.Ann. § 58:10–23.11g(a). However, the Act's contribution provision, N.J.Stat.Ann. § 58:10–23.11f(a)(2), expressly provides that contribution defendants are liable for only those costs listed in N.J.Stat.Ann. § 58:10–23.11g(c), not N.J.Stat.Ann. § 58:10–23.11g(a) as plaintiffs suggest. Subsection 11g(c) allows for cleanup and removal costs only.

8. 42 U.S.C. § 9613(f)(1) states in pertinent part as follows:

 (1) **Contribution**

 Any person may seek contribution from any other person who is liable or potentially liable under Section 9607(a) of this title, during or following any civil action under Section 9606 of this title or under Section 9607(a) of this title ... In resolving contribution claims, the court may

allocate response costs among liable parties using such equitable factors as the court determines are appropriate. Nothing in this subsection shall diminish the right of any person to bring an action for contribution in the absence of a civil action under Section 9606 or Section 9607 of this title.

Damages assessed against that defendant may include "necessary costs of response incurred by any other person consistent with the National Contingency Plan" and "damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction or loss ..." Interest is also available regarding both, and as of the date of payment was demanded in writing or the date of expenditure, whichever is later. 42 U.S.C. § 9607(a)(4)(B) & (C).

Defendants' next argument is that the mandate of 42 U.S.C. § 9607(a)(4)(B), that the response be "consistent with the national contingency plan," was not met by plaintiffs. The NCP sets different standards for compliance depending on whether the action is a removal or a remediation action. The parties disagree as to the description to be given to plaintiffs' actions.

CERCLA defines the words "remove" and "removal" as the "cleanup or removal of released hazardous substances from the environment, such actions as may be necessary [sic] taken in the event of the threat of release of hazardous substances into the environment, such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances, the disposal of removed material, or the taking of such other actions as may be necessary to prevent, minimize, or mitigate damages to the public health or welfare or the environment, which may otherwise result from a release or threat of release." 42 U.S.C.A. § 9601(23).

The terms "remedy" or "remedial action" are defined as, "those actions consistent with a permanent remedy taken instead of or in addition to removal actions in the event of a release or threatened release of a hazardous substances into the environment, to prevent or minimize the release of hazardous substances so that they do not migrate to cause substantial danger to present or future public health or welfare or the environment. The term includes, but is not limited to, such actions at the location of the release as storage, confinement, perimeter protection using dikes, trenches, or ditches, clay cover, neutralization, cleanup of released hazardous substances or contaminated materials ... and any monitoring reasonably required to assure that such actions protect the public health and welfare of the environment.... The term *does not include offsite transport of hazardous substances,* or the storage, treatment destruction, or secure disposition offsite of such hazardous substances or contaminated materials...." *Id.* § 9601(24) (emphasis added).

The ultimate determination of whether response actions are remedial or removal is a question of law. *Reading,* 823 F.Supp. at 1242. Plaintiffs' response in this case must be characterized as a removal action. Plaintiffs' excavation of soil was undoubtedly a "removal of hazardous substances from the environment." 42 U.S.C. § 9601(23). The removal involved "offsite transport of hazardous substances" and thus was clearly not a remedial action. Defendants make much of the fact that the NCP's definition of the term "remedial action" expressly lists excavation of soil as an example of appropriate remedial activities. I do not find this fact to be dispositive. As the Eighth Circuit has put it, "[a]ny distinction between "excavation" of contaminated soils and "removal" of contaminated soils is one that eludes us." I am also unconvinced by defendants argument that the action was not necessary to monitor, assess and evaluate the threat of release of hazardous substances. I therefore conclude that the action was a removal.

Since CERCLA's passage in 1980, the EPA has issued three versions of the NCP—the 1982 NCP, the 1985 NCP, and the 1990 NCP. Although the differences between the 1985 regulations and 1990 regulations are fairly substantial, the parties neglected to address this change or discuss which regulations should apply in this case. As a general matter, courts have evaluated response actions against the NCP in force at the time that such actions were taken. *NL Industries, Inc. v. Kaplan,* 792 F.2d 896, 898 (9th Cir.1986); *Reading Co. v. Philadelphia,* 823 F.Supp. 1218 (E.D.Pa.1993). In this case, since the cleanup ran during both the 1985 NCP and 1990 NCP periods, neither set of regulations would clearly apply. However, because I find that under either set of regulations summary judgment could not be granted, I need not rule at this time on the question of which regulations should apply.[9]

Forty C.F.R. § 300.71 of the 1985 NCP, entitled "Other Party Responses," details the response actions that are considered to be consistent with the NCP. If the response is characterized as a removal action, then it must be taken in circumstances warranting

9. The parties should address this issue in their trial briefs.

removal and be consistent with 40 C.F.R. § 300.65. That section states in relevant part:

> (a)(1) ... the lead agency shall first review the preliminary assessment and the current site conditions to determine if removal action is appropriate.

> (a)(2) Where the responsible parties are known, an effort shall be made to ... have them perform the necessary work.

> (b)(2) The following factors shall be considered by the lead agency in determining the appropriateness of a removal action ...

> (i) Actual or potential exposure to hazardous substances or pollutants or contaminants by nearby populations, animals, or food chain;

> (ii) Actual or potential contamination of drinking water supplies or sensitive ecosystems;

> (iii) Hazardous substances or pollutants or contamination in drums, barrels, tanks, or other bulk storage containers, that may pose a threat of release;

> (iv) High levels of hazardous substances or pollutants or contaminants in soils largely at or near the surface, that may migrate;

> (v) Weather conditions that may cause hazardous substances or pollutants or contaminants to migrate or be released;

> (vi) Threat of fire or explosion;

> (vii) the availability of other appropriate Federal or State response mechanisms to respond to the release;

> (viii) other situations or factors which may pose threats to public health or welfare or the environment. 40 C.F.R. § 300.65 *et seq.* (7–1–89 edition).

Whether plaintiffs' have substantially complied [10] with the NCP standards involves a factual determination. Consequently, under the 1985 NCP, summary judgment may not be granted.

Under the 1990 NCP, a response action will be considered consistent with the NCP "if the action, when evaluated as a whole, is in substantial compliance with the applicable requirements ... and results in a CERCLA quality cleanup." 40 C.F.R. 300.700(c)(3)(i) (7–1–92 edition).

The 1990 NCP, like the 1985 NCP, requires that removal actions be based upon numerous determinations including almost all of those listed in § 300.65 of the 1985 NCP. Consequently, under the 1990 regulations, a factual determination remains as to whether plaintiffs substantially complied with the NCP standards for a removal action.

## V. *Breach of Covenants Against Encumbrances*

Under New Jersey law, acceptance of a deed is deemed to be *prima facie* full execution of an executory contract to convey, unless the contract contains a covenant collateral to the deed. *Caparrelli v. Rolling Greens, Inc.*, 39 N.J. 585, 590, 190 A.2d 369 (1963). Pursuant to this rule of merger, all covenants previously contained in the contract which relate to or are connected with the title, possession, quantity or emblements of the land are satisfied and extinguished. *Id.* at 591, 190 A.2d 369. Thus, acceptance of the deed terminates the contractual relationship between the parties, and their respective rights and liabilities are thereafter determined solely by the deed and not by the contract of sale. *Levy v. C. Young Construction Co., Inc.*, 46 N.J.Super. 293, 296, 134

---

10. Although the 1985 NCP did not mention the standard of compliance necessary to be "consistent" with the NCP, the majority of courts interpreting those regulations prior to the promulgation of the 1990 NCP required "strict compliance" with its provisions. *See e.g., Amland Properties Corp. v. Aluminum Co. of America,* 711 F.Supp. 784, 796–97 (D.N.J.1989).

Since the promulgation of the 1990 NCP, a number of courts have held that the "substantial compliance" standard set forth in the 1990 regulations simply clarify the 1985 NCP, and as a

clarification applies to response costs incurred during the reign of the 1985 NCP. *See Hatco Corp. v. W.R. Grace & Co.—Conn.,* 801 F.Supp. 1309, 1332–33 (D.N.J.1992); *Con–Tech Sales Defined Ben. Trust v. Cockerham,* 1991 WL 209791, at *6 (E.D.Pa.1991); *Reading,* 823 F.Supp. at 1240. I agree. Unless an agency's interpretation of its own regulations is plainly erroneous or inconsistent with the regulation[s], that interpretation has controlling weight. *Udall v. Tallman,* 380 U.S. 1, 16–17, 85 S.Ct. 792, 801–02, 13 L.Ed.2d 616 (1965).

A.2d 717 (App.Div.1957), *aff'd,* 26 N.J. 330, 139 A.2d 738 (1958).

Defendants assert that in order for plaintiffs to prevail on their claims, the deed must contain a covenant against encumbrances. It clearly does. Defendants' belief that it does not is apparently based upon a copy of the deed that is missing the page relevant to this determination. The deed states that the seller "covenant[s], promise[s], and agree[s] ... that it has not made, done, committed, executed or suffered any act or acts, thing or things whatsoever, whereby or by means whereof the above mentioned and described premises, or any part or parcel thereof, now are, or at any time hereafter shall or may be impeached, charged or encumbered, in any manner or way whatsoever." *See* Grochala certification Ex. 8.

Defendants further assert that even if the deed contained a covenant against encumbrances, the contamination of the property was not sufficient to constitute a breach of such covenant.

New Jersey courts have interpreted the term "encumbrance" as used in covenants generally to mean an infringement on the title. *Fahmie v. Wulster,* 81 N.J. 391, 396, 408 A.2d 789 (1979). Thus, a breach of the covenant against encumbrances may be demonstrated by proof establishing that a third person has a right to or an interest in the land conveyed, to the diminution of the land, though consistent with the passing of the fee by the deed of conveyance. *Id.; Gaier v. Berkow,* 90 N.J.Super. 377, 379, 217 A.2d 642 (App.Div.1966). Though physical conditions concerning property have been held to constitute a breach of the covenant against encumbrances, *see e.g., Genetelli v. Percudani,* 142 N.J.Eq. 735, 61 A.2d 264 (E & A 1948), defendants contend that this concept has been rejected in the environmental contamination context based on the court's decision in *Allied v. Frola,* 730 F.Supp. 626 (D.N.J. 1990). However, the court in *Allied* rejected plaintiff's claim because the deed in that case expressly stated that the land was subject to covenants, easements, agreements and restrictions of record. *Id.* at 629.

In *Fahmie,* the New Jersey Supreme Court addressed the issue of whether the concept of encumbrance should be expanded to include structural conditions in the property conveyed which constituted violations of the law or governmental regulations. The Court held that to expand the concept of encumbrances in such a fashion would "create uncertainty and confusion in the law of conveyancing and title insurance." *Fahmie,* 81 N.J. at 397, 408 A.2d 789. Furthermore, the court stated that a "title search would not have disclosed the violation, nor would a physical examination of the premises. The better way to deal with violations of governmental regulations, their nature and scope being as pervasive as they are, is by contract provision which can give the purchaser full protection in a situation such as is here presented." *Id.*

In light of the Court's decision in *Fahmie,* I find that summary judgment must be granted in defendants favor on this claim.[11]

### CONCLUSION

For the reasons set forth above plaintiffs' motion for partial summary judgment is granted on the Spill Act claim and denied on all other claims. Additionally, plaintiffs' request for a declaratory judgment on the issue of defendants' future liability for cleanup costs on the Property is granted. Defendants motion for summary judgment is granted on all claims which plaintiffs have abandoned and on the breach of covenant against encumbrances claim and denied as to all other claims. In each instance where I have held defendants to be liable, Azon's liability is dependant upon a determination whether it is liable by virtue of its purchase of K & E. An appropriate order follows.

---

11. Although the language in the deed here covenants against the property being "impeached" or "charged" as well as "encumbered," I believe that the reasoning of *Fahmie* is clearly applicable.